First Division

December 13, 2004

No. 1-03-0350

THE PEOPLE OF THE STATE OF ILLINOIS,

Plaintiff-Appellee,

v.

ANTHONY BISHOP,

Defendant-Appellant.

)

)

)

)

)

)

)

)

)

)

Appeal from 

the Circuit Court 

of Cook County

01 MC 4014524

Y 9947972

Honorable 

Susan M. Coleman

Judge Presiding

JUSTICE McBRIDE delivered the opinion of the court:

Following a September 2002 bench trial, defendant, Anthony Bishop, was convicted of driving under the influence of drugs (DUI) pursuant to section 11-501(a)(6) of the Illinois Vehicle Code (625 ILCS 5/11-501(a)(6) (West 2000)) for a November 2001 automobile accident.  Defendant appeals, arguing that (1) the State did not follow regulations when taking a urine sample; (2) the State failed to present evidence that the medication given to defendant in the course of treatment did not affect his urine sample; (3) the State failed to establish a sufficient chain of custody for the urine sample and did not deliver the sample to the police laboratory within an acceptable amount of time; (4) the trial court improperly imposed fees that did not exist at the time of the offense or were a smaller statutory fee at the time of the offense; and (5) the trial court failed to consider defendant’s ability to pay in imposing fines on defendant.

The following evidence was presented at defendant’s bench trial.

Dr. Jeffrey Silver testified that he is a general surgeon at Loyola University Medical Center.  On November 20, 2001, Dr. Silver was on duty at about 11 p.m.  Around that time, he went to the emergency room in response to a person brought in after a vehicle collision.  Dr. Silver identified that person as defendant.  Dr. Silver characterized defendant as combative, in that he was fighting off the efforts of the transport people, the “pre-op” team, and the emergency room staff.  Defendant needed to be restrained.  Defendant also seemed disoriented.

Dr. Silver stated that defendant was classified as a red trauma, meaning that there was serious potential trauma.  All red-level traumas “get” a urine and blood screen as part of the normal course of medical treatment.  Defendant’s urine screen tested positive for cocaine and PCP.
(footnote: 1)
 On cross-examination, Dr. Silver stated that defendant was given medication during treatment.  Dr. Silver testified that defendant was given succynil choline for intubation, Versed as a sedative, and Norcuron, a muscle sedative to temporarily paralyze the patient.  Dr. Silver also said that the urine sample was taken from defendant’s catheter bag as part of the hospital standard, but he did not observe the actual draw of urine.

Frank Parra testified that on November 20, 2001, he was walking to the gas station at Roosevelt Road and Ridgeland Road in Oak Park, Illinois.  He heard what he thought was a car crash, but was actually a car jumping off the curb. It jumped the curb on Roosevelt and took out a street sign.  He turned to look and saw a car speeding from the front of Pete’s Restaurant, which is located at that intersection.

Parra continued to watch the car.  He saw that the driver’s-side door was open and the driver had his left foot out of the door.  Parra saw that the driver’s right foot was on the accelerator.  He did not see the driver hit the brake at any point.  Parra was between 15 and 20 feet away when he first observed the car.  Parra watched the car go from Roosevelt to Ridgeland and drive on the opposite side of the street.  The car was heading northbound on Ridgeland in the southbound lane.  The car kept crossing traffic.  Parra saw the car turn toward an alley, but it missed, hit a guard rail and crashed head first into a dumpster in the back of Pete’s Restaurant.

Parra went over to the car and saw that the dumpster was on top of the car.  Parra saw the driver of the vehicle and identified him as defendant.  Parra told defendant to relax and that an ambulance was being called.  Defendant said nothing.  Parra stated that defendant appeared confused and “out of it.”

Officer O’Connor with the Oak Park police department testified that he was called to the scene at Roosevelt and Ridgeland on November 20, 2001.  He observed a red Mercury pinned underneath a dumpster which was located on the side of a restaurant.  Officer O’Connor identified defendant as the driver of the vehicle.  Defendant was unconscious when Officer O’Connor first saw him, but he opened his eyes when the officer tapped him on the shoulder.  Officer O’Connor asked him if was hurt, but defendant mumbled and Officer O’Connor was unable to understand him.

Officer O’Connor later testified that he read the “Warning to Motorists” to defendant at the hospital.  Defendant was unconscious at that time.  He also wrote defendant tickets for driving on a sidewalk and two DUI tickets.

Kyle Bush testified that he is a firefighter paramedic for the Oak Park fire department and on November 20, 2001, he was dispatched to a motor vehicle accident on Ridgeland.  He saw a vehicle wedged underneath a dumpster behind a restaurant.  Bush identified defendant as the driver of the car. Once defendant was extricated from the vehicle, Bush observed that defendant appeared very confused and bewildered.  Defendant was unable to recall events prior to the accident.  Defendant either did not answer or answered inappropriately to the questions asked by Bush and other paramedics.  He did not answer when Bush asked the defendant if he knew where he was.  Defendant also did not answer when asked if he knew his name or how he got underneath the dumpster.  

Defendant was immediately placed on a back board and collar.  As part of his work duties, Bush has received training about the signs and symptoms of people under the influence of drugs.  Bush also has observed many people under the influence of drugs in the course of his work as a paramedic.  Bush stated that defendant presented the signs of an altered mental status.  He administered a drug to defendant that reverses the effect of narcotics and opiates.   

On cross-examination, Bush stated that he administered the drugs intravenously.  He said that he cleaned the area with an alcohol swab and Providone Iodine swab.

Officer Razzino of the Oak Park police department testified that in the early morning hours of November 21, 2001, he responded to assist Officer O’Connor at Loyola Hospital.  At around 3:30 a.m., Officer Razzino directed a patient care technician to draw samples from defendant.  Officer Razzino opened a sealed DUI kit to get the materials.  He observed the technician draw two vials of blood via defendant’s intravenous tube.  The vials were sealed with the proper label from the DUI kit.  Officer Razzino wrote the date, his badge number and his initials, and defendant’s name on the vials and the hospital technician initialed them as well, and Officer Razzino placed them back into the DUI kit.  Two sealed and clean plastic containers from the DUI kit were used to obtain defendant’s urine sample.  The urine was drawn from defendant’s catheter.  The urine samples were sealed and the same identifying information was written on the containers as on the vials, and then placed in the DUI kit.  Then, Officer Razzino sealed the DUI kit with a label and Officer Razzino wrote additional identifying information on the sealed DUI kit.  

The DUI kit remained in his possession until Office O’Connor returned to the hospital and he gave the kit to Officer O’Connor.  Officer O’Connor returned the DUI kit to the police station and Officer Razzino assisted in inventorying the kit.  It was placed in the evidence technician’s refrigerator.  Officer Razzino does not personally know how the DUI kit was delivered to the laboratory.

Jennifer Wanat testified that she is a forensic scientist with the Illinois State Police, Westchester Forensic Laboratory.  Wanat stated that she first received the sealed DUI kit on December 6, 2001.  The DUI kit was dropped off at the laboratory by Officer Durfor.  The DUI kit was sealed with tamper-proof seals provided in the kit.  It had not been opened since the final seal was placed on the kit.  Wanat made copies of the DUI kit.  Wanat opened the kit and observed two vials of blood and two samples of urine.  All samples were sealed with labels and identified with defendant’s name on the label as well as the investigating officer’s badge number, the date and offense.  Wanat performed a series of tests on the urine sample, and the test results indicated the presence of cocaine, metabolites, midazolam, morphine, and PCP. After she completed her analysis, Wanat placed the samples back into the kit and placed them in the evidence vault.  

Wanat also testified that she has had training to state the typical reaction a person may have from medication.  Wanat stated that she has heard of Versed and that it is like a sedative.  Wanat said that Versed would not influence the results of her testing.  Wanat stated that she is not familiar with Norcuron.  She did not testify any further on any possible effect medication would have on defendant’s sample.

     On cross-examination, Wanat testified that the DUI kit was received at the lab by a forensic scientist named Tara Langheim.  Langheim placed the kit in a refrigerator and then the toxicologist vault, and Wanat retrieved it from the vault.  Wanat did her testing in this case from December 10
 to 13
 of 2001.  Between December 6
 and 10
, Wanat completed testing on her previous case group.  

Officer O’Connor was recalled and testified that he received the DUI kit from Officer Razzino.  Officer O’Connor transported the kit in his squad car to the police station from Loyola Hospital.  He inventoried the DUI kit at the station with Officer Razzino.

Following Officer O’Connor, the State rested.  Defendant moved for a directed verdict, which the trial court denied.  The defense rested.  The trial court found defendant guilty of DUI under section 11-501(a)(6) of the Illinois Vehicle Code ( 625 ILCS 5/11-501(a)(6) (West 2000)) and guilty of failing to reduce speed to avoid an accident. 

The record on appeal does not contain a transcript of defendant’s sentencing hearing.  The record contains a certification by the official court reporter that he made “a thorough and diligent search of all stenographic notes recorded by me on the day of February 10, 2003, before the Honorable Susan M. Coleman, Judge of said Court, and I find no recordings of proceedings of the above-entitled cause.”  The parties presented an agreed statement of facts indicating that the trial court sentenced defendant to 18 months’ supervision and fined him $555.

This appeal followed.

Defendant challenges the urine sample taken for the police investigation because it was not drawn in strict compliance with section 1286.330(d) of the Illinois State Police Regulations (20 Ill. Adm. Code §1286.330(d) (2002)) that was in effect at the time of defendant’s offense.  Section 1286.330(d) provides: “The urine sample shall be collected from the subject's first emptying of the bladder in a clean, dry container.”  20 Ill. Adm. Code §1286.330(d) (2002).  Defendant argues that the police failed to offer the results from the first emptying of defendant’s bladder, and accordingly, the tested sample presented insufficient evidence of drugs in defendant’s system.  Defendant’s claim is based on the fact that in the course of defendant’s treatment, the hospital drew the first urine sample and the second sample taken by the police was drawn hours later.  According to defendant, the second sample does not conform with the exact language of section 1286.330(d).  The State responds that defendant’s urine sample was drawn in substantial compliance with the existing administrative regulations.

While no case law addresses whether substantial compliance with administrative regulations related to urine samples is permissible, we are guided by cases considering whether substantial compliance satisfied regulations for Breathalyzer tests.  In 
In re Summary Suspension of Driver’s License of Ramos
, 155 Ill. App. 3d 374, 376 (1987), the Fourth District found that substantial compliance was sufficient to satisfy the requirement that a defendant be continuously observed for 20 minutes prior to being administered the Breathalyzer test. In that case, the state trooper substantially complied when he kept the defendant seated within his peripheral view while he set the machine.  
Ramos
, 155 Ill. App. 3d at 376.  Similarly, the Fifth District in 
People v. Bergman
, 253 Ill. App. 3d 369, 374 (1993), found that a state trooper substantially complied with the 20-minute observation requirement even though he left the room briefly two times, but kept defendant within his line of sight.  The 
Bergman
 court also held that the defendant’s ingestion of breath mints during the observation time did not “establish as a matter of law that the 20-minute observation period was not maintained.”  
Bergman
, 253 Ill. App. 3d at 375.

The State relies extensively on the Ohio Supreme Court decision in 
Ohio v. Burnside
, 100 Ohio St. 3d 152, 797 N.E.2d 71 (2003).  The Ohio Supreme Court had previously found that “rigid compliance with the *** Ohio Administrative Code is not a prerequisite” to the admissibility of alcohol-test results.  
Burnside
, 100 Ohio St. 3d at 156, 797 N.E.2d at 75; see 
State v. Steele
, 52 Ohio St. 2d 187, 370 N.E.2d 740 (1977).  
Burnside
 engages in a helpful discussion concerning the question of substantial compliance.  The 
Burnside
 court noted that Ohio appellate courts have developed two approaches in determining substantial compliance.  
Burnside
, 100 Ohio St. 3d at 157-58, 797 N.E.2d at 76.  The first considers whether the noncompliance rendered the test results unreliable, and under this approach,  a court will conclude that the State has substantially complied with the regulations if the alleged deviation did not affect the reliability of the test results.  
Burnside
, 100 Ohio St. 3d at 158, 797 N.E.2d at 76.  The second approach looks at whether the alleged deviation prejudiced the defendant, and a court will conclude that the State has substantially complied with the regulations so long as the alleged deviation did not cause an erroneously higher test result.  
Burnside
, 100 Ohio St. 3d at 158,  797 N.E.2d at 76.

We find that strict compliance is not required for admissibility of chemical test results under section 1286.330(d) of the Illinois Administrative Code rather substantial compliance is sufficient.  We also conclude that substantial compliance was met here.  In this case, the police were prevented from taking the urine sample from the first emptying of the bladder by hospital procedure .  Dr. Silver testified that hospital procedure requires a blood and urine screen on all red-level trauma patients, and therefore, the hospital took defendant’s urine sample first. The fact that the urine sample taken by the police was taken after the hospital’s does not make the test unreliable.  This deviation would not affect the reliability of the results.  Defendant also suffered no prejudice from the use of a later sample.  A later sample could possibly favor defendant by containing a smaller concentration of drugs.
  See 
Skinner v. Ry. Labor Executives’ Ass’n
, 489 U.S. 602, 623, 103 L. Ed. 2d 639, 664, 109 S. Ct. 1402, 1417 (1989).

Additionally, defendant’s position is impractical because here the State would be prevented from prosecuting defendant for DUI when his accident and resulting medical treatment are the reason that the police were unable to strictly comply with the administrative regulations.  As the 
Burnside
 court noted, if we were to agree that any deviation whatsoever from the regulations rendered the results of a sample inadmissible, “we would be ignoring the fact that strict compliance is not always realistically or humanly possible.”  
Burnside
, 100 Ohio St. 3d at 159, 797 N.E.2d at 77.

Moreover, we note that section 1286.330(d) was recently amended to exclude the requirement that the urine sample be from the first emptying of the bladder.  Section 1286.330(d), effective June 30, 2004, reads: “Urine sample shall be collected in clean, dry containers.”  20 Ill. Adm. Code §1286.330(d) (2004).  While we are not applying the newly amended version in this case, the amendment further supports our conclusion that the police substantially complied with the regulations even though they obtained their urine sample after the first emptying of the bladder.
  The deletion of the language requiring a urine sample be taken from the first emptying of the bladder indicates that such a requirement is not necessary to preserve the reliability of the test results.  The substantial compliance by the police in this case provided equally reliable test results without prejudicing defendant.   

Next, defendant contends that the State failed to show that defendant’s medical treatment did not affect his urine sample.  However, as the State points out, defendant objected to the relevancy of such questioning. During Wanat’s testimony, the following colloquy occurred:

“MR. CHAN [Assistant State’s Attorney]: What is your education, training and experience regarding the effects of medications on the person’s blood?

JENNIFER WANAT: I could tell you typical reactions that a person may have, but I cannot tell you the influence of one drug upon another drug.

MR. CHAN: Thank you.  That is, for example, Versed, and Norcuron.  Do you know what those are?

WANAT: I have heard of Versed but I have not heard of the second drug.

MR. CHAN: What is Versed?

WANAT: It is like a sedative.

MR. CHAN: Would it have any influence on the results of the drug test that you performed?

***

WANAT: It would not influence my results.

MR. CHAN: Would that medication show the presence of cocaine or PCP in the urine?

WANAT: No.

MS. MALONEY: I am going to object.

THE COURT: I am going to sustain it.

MS. MALONEY: Foundation.

MR. CHAN: And what about Norcuron, a muscle sedative. Would it effect the results of your tets?

MS. MALONEY: I am going to object.

THE COURT: Sustained. She just indicated that she didn’t know what that was, isnt’t that what you said?

WANAT: I do not know what that drug is.

***

MR. CHAN: Okay.  Based on your experience and knowledge and training, are there any medications that would produce – that would influence the PCP result in the urine sample?

MS. MALONEY: I am going to object to the specificity of this case and this test and it’s just not relevant.

THE COURT: At this juncture I don’t think it is relevant either.”

We agree with the State that because defendant raised an objection on the grounds of relevancy when the assistant State’s Attorney was asking Wanat, the forensic scientist, about the possible effects the “medications” would have on defendant’s urine sample, defendant cannot now claim error.  The trial court specifically noted defendant’s earlier objection to this testimony when it denied defendant’s post-trial motion.  Where the trial court's course of action is taken at defendant's suggestion and the defendant thereafter acquiesces in the court's expressed course of conduct, the defendant should be precluded from raising such course of conduct as error on appeal.  
People v. Abston
, 263 Ill. App. 3d 665, 671 (1994).   Therefore, defendant is precluded from raising this issue on appeal.

However, defendant’s argument also fails on its merits.  Defendant relies on 
People v. Miller
, 166 Ill. App. 3d 155, 158 (1988), for the proposition that when a defendant is administered medication before a urine sample is drawn, the State must prove the prescribed medication did not affect the accuracy of the test.  Defendant argues that the State must present such evidence as an element of its case.  Defendant raised this issue in his post-trial motion.  The trial court disagreed with defendant’s argument and found that 

“the State is not required to prove a lack of effect unless and until the defendant were to provide some evidence that the prescribed medication did affect the accuracy of the test.

Otherwise, *** if there wasn’t some type of evidence that was required *** the Court would have to indulge in speculation to accept the defendant’s suggestion that the [medication] that he was prescribed did affect the test samples and results; and there was no testimony *** from any expert or anyone *** that the prescribed medications would have affected the urine samples which were subsequently taken from [defendant].”

We conclude that unless there is some evidence in the record that a medication somehow affected the accuracy of the test results, the State is not required to prove the test results were not altered by the medications.  
People v. Winfield
, 30 Ill. App. 3d 668, 672 (1975).  In 
Winfield
, the defendant argued that the State was required to show that defendant was not given some treatment at the hospital that would have affected his Breathalyzer results.  The court believed that contrary was true and held that “tests are admissible in the absence of some evidence of recent medical treatment affecting the test results.”  
Winfield
, 30 Ill. App. 3d at 672.  In this case,  defendant is essentially arguing that once a defendant is given medication, then the test results are inaccurate unless the State proves otherwise.  Defendant’s argument, however, ignores the second prong under 
Winfield
, which is that the test results remain accurate and admissible until some evidence is presented that a medication given to a defendant 
affected
 the accuracy of the test.  To the extent that 
Miller
 goes beyond the holding in 
Winfield
 and suggests that the State must prove that any prescribed medication did not affect the test results as an element of its case, we disagree with such a requirement and we note that 
Miller
 cites no authority to support its conclusion.  Here, there was simply no evidence that the medications given to defendant had any affect on the results of his urine sample, and in the absence of such evidence, the State was not required to prove that results were not affected by the medications.  
Winfield
, 30 Ill. App. 3d at 672.      

Defendant also asserts that the police failed to comply with section 1286.330(g) by not delivering the DUI kit to the laboratory “as soon as practicable.”  Here, defendant’s DUI kit was taken in the early morning hours of November 21, 2001, and the DUI kit was delivered to the police laboratory on December 6, 2001.  Defendant claims that this lapse of 15 days is not excusable under the regulations.  

Section 1286.330(g) provides: “The urine samples shall be delivered as soon as practicable to a laboratory certified by the Department.”  20 Ill. Adm. Code §1286.330(g) (2002).  The regulations offer no further explanation as to what time frame is “as soon as practicable.”  In 
People v. Jennings
, 301 Ill. App. 3d 794, 797 (1998), the Fourth District considered whether 18 days between a blood sample being drawn and being delivered to a laboratory qualified as being “directly” transported under section 510.110(a)(4)(D) of Title 77 of the Code (77 Ill. Adm. Code
 
§510.110(a)(4)(D) (1996)).  The 
Jennings
 court concluded that “the ‘direct delivery’ rule was adopted to help ensure the samples were safely delivered and properly identified and not because the samples needed to be tested within a certain time frame,” and the fact that 18 days lapsed between withdrawal and delivery of the blood did not cast doubt as to the identity of the blood sample or accuracy of the test results.  
Jennings
, 301 Ill. App. 3d at 797.

Likewise, the language “as soon as practicable” serves to ensure delivery to a laboratory, but does not mandate immediate delivery.  Officer Razzino testified that the DUI kit was new before he opened it.  He stated that he sealed and labeled the individual samples, and then sealed the entire kit.  Wanat testified that she received the kit at the laboratory in a sealed condition.  The samples had not been disturbed.  The passage of 15 days between withdrawal and delivery does not render the results suspect where the trial testimony indicated that the kit remained sealed and able to be tested.

Defendant next contends that the State failed to establish a continuous chain of custody for the DUI kit.  The State maintains that it presented adequate proof of the chain of custody.  A sufficient chain of custody does not require that every person involved in the chain testify, nor must the State exclude all possibilities that the evidence may have been subject to tampering. 

People v. Harris
, No. 1-03-0674, slip op. at 7 (August 26, 2004).  The State must demonstrate that the evidence has not been changed in any important respect and  is required to establish that it took reasonable protective measures since the substance was seized.  
Harris
, No. 1-03-0674, slip op. at 7.  In the absence of actual evidence of tampering, substitution, or contamination, the State satisfies its burden by showing that reasonable measures were employed to protect the evidence from the time that it was seized and that it was improbable the evidence was altered.
  
Harris
, No. 1-03-0674, slip op. at 7.  Therefore, evidence may be properly admitted, even where there is a missing link in the chain of custody, if there is testimony sufficiently describing the condition of the evidence when delivered which matches the description of the evidence when examined.  
Harris
, No. 1-03-0674, slip op. at 7-8.

Defendant claims that the chain of custody is insufficient because no one testified about what happened to the urine sample from the time it was refrigerated at the police station on November 21, 2001, and when it was delivered to the laboratory on December 6, 2001.  He also says that no evidence was offered as to whether the sample was refrigerated from December 10 through 13 when Wanat performed her analysis.  Defendant additionally asserts that no evidence was presented as to the security of the refrigerator at the police station and the laboratory.

The State presented the testimony of Officer Razzino, Officer O’Connor and Wanat.  Officer Razzino stated that he was present when the samples were taken for the DUI kit.  He testified that he personally affixed the seals and labeled the samples.  Officer O’Connor took the DUI kit to the police station and inventoried the kit with Officer Razzino on November 21.
 
 Wanat said that she received the DUI kit in sealed condition.  She stated that the seals were tamper-proof and remained in that condition.  While she personally did not receive the kit, she testified that it was hand delivered by Officer Durfur to her colleague, Tara Langheim, at the laboratory and placed in the evidence locker.

Based on this testimony, we find that the State presented a sufficient chain of custody.  Defendant did not produce any actual evidence of any tampering or contamination.   The witnesses testified that the DUI kit was labeled with the date, Officer Razzino’s badge number and initials, the hospital technician’s initials, defendant’s name, and the offense.   There was no question of tampering due to a faulty chain of custody.   The DUI kit remained sealed and no evidence of any harm to the sample was presented.  Additionally, Wanat testified that she followed the generally accepted methods of testing for her field and that she follows the same procedure in all her cases.  The State’s witnesses established a reasonable probability that no tampering or contamination occurred with defendant’s urine sample, and any questions raised properly went to the weight of the evidence.

The next issue raised by defendant is that the trial court improperly assessed fees that were not in accordance with those in effect at the time of defendant’s offense.  Defendant contends that the trial court incorrectly assessed a $100 Trauma Center Fund fee and $5 Spinal Cord Injury Paralysis Cure Research Trust Fund (Spinal Cord Fund) fee against defendant because at the time of defendant’s offense the Trauma Fund fee was $25 and the Spinal Cord Fund fee did not exist.  See Pub. Act 92–431, eff. January 1, 2002.  Defendant maintains that the imposition of these fees is a violation of 
ex post facto
 laws and the fees should be eliminated and/or reduced to those in effect at the time of defendant’s offense.  The State responds that the fees were not punitive in nature and are not in violation of the prohibition against 
ex post facto 
laws.

Imposition of a punishment greater than the one in effect when the crime was committed constitutes a violation of the prohibition of 
ex post facto
 laws in the United States and Illinois Constitutions.  U.S. Const., art. I, §10; Ill. Const. 1970, art. I, §16.  That ban against 
ex post facto
 laws applies only to laws that are punitive in nature, and it does not apply to costs, which are compensatory, not punitive.  
People v. Timmons
, 114 Ill. App. 3d 861, 871 (1983).

The revised version of section 5-9-1(c-5) provides:

 “In addition to the fines imposed by subsection (c), any person convicted or receiving an order of supervision for driving under the influence of alcohol or drugs shall pay an additional $100 fee to the clerk. This additional fee, less 2 1/2 % that shall be used to defray administrative costs incurred by the clerk, shall be remitted by the clerk to the Treasurer within 60 days after receipt for deposit into the Trauma Center Fund. This additional fee of $100 shall not be considered a part of the fine for purposes of any reduction in the fine for time served either before or after sentencing. Not later than March 1 of each year the Circuit Clerk shall submit a report of the amount of funds remitted to the State Treasurer under this subsection (c-5) during the preceding calendar year.” 730 ILCS 5/5-9-1(c-5) (West 2002).

Additionally, section 5-9-1(c-7) created the Spinal Cord Fund fee as follows:

“In addition to the fines imposed by subsection (c), any person convicted or receiving an order of supervision for driving under the influence of alcohol or drugs shall pay an additional $5 fee to the clerk. This additional fee, less 2 1/2 % that shall be used to defray administrative costs incurred by the clerk, shall be remitted by the clerk to the Treasurer within 60 days after receipt for deposit into the Spinal Cord Injury Paralysis Cure Research Trust Fund. This additional fee of $5 shall not be considered a part of the fine for purposes of any reduction in the fine for time served either before or after sentencing. Not later than March 1 of each year the Circuit Clerk shall submit a report of the amount of funds remitted to the State Treasurer under this subsection (c-7) during the preceding calendar year.”  730 ILCS 5/5-9-1(c-7) (West 2002).

The cardinal rule of statutory interpretation, to which all other rules are subordinate, is to ascertain and give effect to the intent of the legislature.  
People v. Maggette
, 195 Ill. 2d 336, 348 (2001).  In determining the legislature's intent, a court should first consider the statutory language; this is the best means of determining the legislative intent.  
Maggette
, 195 Ill. 2d at 348.

As a means of determining legislative intent, case law has examined the substance of various assessments to determine whether they are more nearly “fines” or “fees” or “costs.”  
People v. Elizalde
, 344 Ill. App. 3d 678
, 682 (2003).   A “fine” is a pecuniary punishment imposed as part of a criminal sentence, while a “fee,” by contrast, is a charge for labor or services, especially professional services.  
Elizalde
, 344 Ill. App. 3d at 682.  A fee is not punitive in nature but is a collateral consequence of the defendant's conviction that is compensatory in nature.  
Elizalde
, 344 Ill. App. 3d at 682. 

Sections 5-9-1(c-5) and (c-7) dictate the payment of fees to the Trauma Center Fund and the Spinal Cord Injury Paralysis Cure Research Trust Fund, respectively.  The plain language of the statute refers to both as “fees.”  If these “fees” were meant to be considered “fines” then the legislature’s decision to call them “fees” would have no meaning.  As in 
Elizalde
, this language, by its repeated use of the word “fee,” indicates an intent on the part of the legislature that an assessment made under sections 5-9-1(c-5) and (c-7) be treated as a fee and not a fine.  See 
Elizalde
, 344 Ill. App. 3d at 682.  Therefore, the fees assessed to defendant under sections 5-9-1(c-5) and (c-7) are compensatory, not punitive in nature, and are not subject to 
ex post facto
 violations.   

Finally, defendant contends that the trial court improperly imposed fines and fees against him without considering his ability to pay.  The State points out that defendant has failed to present a transcript of his sentencing hearing as part of the record on appeal.  Defendant asserts that he tried to obtain the transcript, but the court reporter was unable to find the transcript.  The parties presented an agreed statement of facts that the trial court imposed 18 months’ supervision and a total of $555 in fines.  The agreed statement of facts makes no mention as to whether the trial court did or did not consider defendant’s ability to pay.

Responsibility for preserving and presenting a sufficient record of the asserted error necessarily falls on the party who makes the assertion of error.  
People v. Stewart
, 179 Ill. 2d 556, 565 (1997).  When the record presented on appeal is incomplete, a court of review will indulge in every reasonable presumption favorable to the judgment from which the appeal is taken, including the presumption that the trial court ruled or acted correctly, and any doubt arising from the incompleteness of the record will be resolved against the appellant.  
Stewart
, 179 Ill. 2d at 565.

Here, defendant bore the burden of presenting a sufficient record containing the alleged error by the trial court.  As conceded by defendant, the record before this court does not contain the sentencing hearing.  Defendant attempted to remedy this absence with an agreed statement of facts.  However, this statement makes no mention of the alleged error of which defendant now complains.  In the absence of any indication otherwise, we will presume that the trial court properly considered defendant’s ability to pay the fines imposed and decline to find any error.

Moreover, the State points out that documents in the record would satisfy any inquiry by the trial court as to defendant’s ability to pay.  A trial judge need not specifically state that a defendant was determined to have the financial resources and ability to pay because such finding is implicit in the imposition of a fine where the judge is aware of the facts that support such a determination.  
People v. Jumper
, 113 Ill. App. 3d 346, 353 (1983).  While the record on appeal in this case does not contain a transcript of the sentencing hearing, the record does contain defendant’s Alcohol and Drug Evaluation Uniform Report.  In this report, defendant indicated that he was employed full time as a laborer and he requested to complete his treatment in Rockford because he worked there.  The supreme court in 
People v. Maldonado
, 109 Ill. 2d 319, 324-25 (1985), found that the trial court’s remarks that defendant had been employed and was on unemployment was sufficient consideration of defendant’s financial resources and future ability to pay.  Defendant’s report contained sufficient information to be deemed an adequate inquiry into his financial resources and future ability to pay.

Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

Affirmed.

CAHILL, P,J. and O’MALLEY, J., concur.

FOOTNOTES
1: However, the trial court stated that it was not considering “against this defendant any of the evidence that was presented by the State with regard to any sample that the doctor may have testified to.”