2017 IL App (1st) 1-16-1595

No. 1-16-1595

Fourth Division
December 14, 2017

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
|  | ) |  |
| Plaintiff-Appellee, | ) |  |
|  | ) |  |
| v. | ) | No. 10 CR 2330 |
|  | ) |  |
| RYISHIE ROBINSON, | ) | The Honorable |
|  | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge Presiding. |
|  | ) |  |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Burke and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1        On January 14, 2010, defendant was arrested after the victim, Eugene Witherspoon, discovered defendant in Witherspoon's apartment attempting to remove a television set. After a bench trial, defendant was convicted of both residential burglary and aggravated battery of Witherspoon. 720 ILCS 5/19-3(a), 12-4(a) (West 2008). Defendant filed a *pro se* posttrial motion for a new trial claiming ineffective assistance of trial counsel, which the trial court denied after conducting a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d

181, 189 (1984). Defendant's trial counsel also filed a posttrial motion for a new trial with numerous claims, which was also denied. After hearing arguments on aggravation and mitigation, the trial court sentenced defendant to 30 years with the Illinois Department of Corrections (IDOC) for residential burglary and 7 years for aggravated battery, to run concurrently.

¶ 2      On direct appeal, both defendant and the State agreed that the fines and fees order should be modified, and we corrected the "Order Assessing Fines, Fees, and Costs," such that the total fees and costs due from defendant was $365. We also found that his extended-term sentence on the lesser offense of aggravated battery was not warranted, and we corrected the mittimus to reflect a five-year sentence for that offense. However, we did not find persuasive defendant's claims (1) that the State's evidence was insufficient to prove residential burglary and aggravated battery or (2) that his sentence for residential burglary was excessive.

¶ 3      In addition, we remanded for a new *Krankel* hearing before a different judge, finding that "the State's participation changed the preliminary *Krankel* hearing from an objective or neutral inquiry into an adversarial inquiry." *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 81. Since we determined that the preliminary *Krankel* hearing was not properly conducted, we did not consider at that time "the merits of the trial court's *Krankel* findings." *Robinson*, 2015 IL App (1st) 130837, ¶ 82.

¶ 4      On remand, a different trial judge conducted a new preliminary *Krankel* hearing and again denied defendant's *pro se* motion for a new trial based on his trial counsel's alleged ineffectiveness. Defendant now appeals, claiming (1) that the trial court should have appointed new counsel at the conclusion of the new preliminary *Krankel* inquiry and (2) that defendant's fines and fees order must be corrected again. The State agrees that the fines and

fees order should be corrected again, and we so order it, as we detail below. However, we do not find defendant's *Krankel* arguments persuasive and affirm his conviction and sentence.

¶ 5                                                    BACKGROUND

¶ 6                                                 I. Evidence at Trial

¶ 7            We provided a detailed description of the evidence at trial in our prior opinion, and we incorporate that opinion by reference. *Robinson*, 2015 IL App (1st) 130837, ¶¶ 6-25. In sum, the State's evidence at trial established that, on January 14, 2010, Eugene Witherspoon, a security guard and resident of an apartment building located on East 46th Street in Chicago, was outside talking to a number of employees from a security company about installing security cameras in the building. His wife, Mary Johnson, was asleep in their second-floor apartment. While outside discussing the installation of security cameras, Witherspoon heard a noise from inside the building and ran to the third floor, where he believed the noise originated from. He then descended to the second floor, where he observed a woman exiting his apartment with his laptop. Rather than follow this woman, Witherspoon entered his apartment to check on his wife and observed defendant in his apartment wrapping an unplugged television cord around Witherspoon's television set. While defendant and Witherspoon testified to differing versions of the events that followed, it is undisputed that a physical altercation between defendant and Witherspoon ensued and that, during this altercation, defendant bit off part of Witherspoon's lower lip. Witherspoon testified that he and defendant fought in Witherspoon's living room for 5 to 10 minutes before the fight moved to the hallway and then down the stairs. By contrast, defendant testified that the fight

began in the hallway of the building, after Witherspoon hit defendant from behind several times in the head with a gun.

¶ 8       The State's evidence at trial consisted of the testimony of four witnesses: (1) Eugene Witherspoon, the victim, (2) Mary Johnson, Witherspoon's wife, who was asleep in the apartment at the time of the incident, (3) police officer John Thill, one of the arresting officers, and (4) police officer Thomas Ellerbeck, one of the evidence technicians who processed the crime scene. The parties also stipulated to the testimony of Michael Cox, the Illinois State Police crime lab fingerprint examiner who reviewed fingerprints from the crime scene.

¶ 9       The parties stipulated that Cox, a senior fingerprint examiner for the Illinois State Police crime lab, would testify that, in Cox's opinion, based upon a reasonable degree of scientific certainty, one of the two latent prints recovered at the crime scene belonged to defendant.

¶ 10      After the State rested in its case-in-chief, defendant testified that, on January 14, 2010, defendant was walking to work when he was approached by a woman he recognized because she frequented the restaurant where he worked. The woman, who defendant knew as "Wanda," asked defendant to help her move. Defendant had 45 minutes before he needed to be at work, and he agreed to help her. Defendant followed her to an apartment building on East 46th Street where Wanda opened the door to an apartment and led defendant inside.

¶ 11       Defendant testified that, once they were inside the apartment, Wanda indicated that defendant should take the television set, which was already on the floor. Then Witherspoon opened the apartment door, observed defendant and Wanda, and yelled "Wanda, what the f*** is you doing?" Wanda responded that she was retrieving her belongings and she began

4

arguing with Witherspoon. Defendant moved into the hallway, unsure of what was happening. Wanda walked into the hallway of the building, telling defendant that she would have to retrieve her belongings at another time. Defendant began to follow Wanda down the stairs when Witherspoon hit defendant from behind several times in the head with a gun. Defendant and Witherspoon began to wrestle and, at one point during the ensuing fight, Witherspoon yanked defendant toward him, and defendant bit Witherspoon's lip. After defendant bit Witherspoon's lip, Witherspoon released defendant, and Wanda and defendant started to leave. As Wanda held the door open for defendant to leave, Witherspoon used his gun to shoot the front door of the building, shattering the glass in the door.

¶ 12    Defendant testified that two men then entered the building to ask what was happening. Witherspoon told the men that defendant had tried to rob his apartment. The men calmed Witherspoon down, and defendant and Witherspoon sat in the hallway until the police arrived. When the police arrived, they questioned one of the men who was still in the hallway, and this man informed the police officer that he was unsure of what had happened. The police transported defendant to the police station and then to Provident Hospital. At the hospital, defendant received medical attention, which included eight staples in three different locations on the back of his head.

¶ 13    On cross-examination defendant admitted that a jacket, hat, glove, cigarette butt, pocket knife, and cell phone found in the hallway of the building belonged to him. However, defendant denied owning a flathead screwdriver that was also found in the hallway and denied possessing a Phillips-head screwdriver found in his pocket when he was transported to the police station. Defendant further testified that, when he arrived at the apartment building, Wanda opened the door to the building without a key and without needing to be

buzzed into the building. While walking up the stairs of the building, defendant was "two or three stairs" behind Wanda and did not observe if she used a key to open the door to the apartment. The door was already open, and Wanda was entering the apartment when defendant reached the top of the stairs. Defendant also testified that he never observed a computer in the apartment and that Wanda did not have a bag or a computer when she exited the apartment building.

¶ 14      During cross-examination, defendant did not acknowledge specifically meeting with an assistant State's Attorney (ASA), but he did acknowledge that "a woman" tried to talk to him while defendant was at the police station. Defendant denied talking to this woman or to any other individual at the police station.

¶ 15      After cross-examination, the defense moved into evidence the medical records from Provident Hospital that detailed defendant's injuries. The State did not object, and the trial court admitted the medical records into evidence.

¶ 16      After the defense rested, the State introduced in rebuttal a stipulation which stated that if a certain ASA were called to testify, she would testify to the contents of a postarrest statement made by defendant. Similar to defendant's trial testimony, the statement described how defendant was helping a woman named Wanda move her things out of an apartment when a physical altercation occurred between defendant and Witherspoon.

¶ 17                       II. Conviction and Posttrial Motions

¶ 18      At the close of the bench trial on December 3, 2012, the trial court found that Witherspoon's testimony and Johnson's testimony were credible and defendant's testimony was not. The trial court then found defendant guilty of (1) residential burglary, (2) aggravated

battery by great bodily harm, (3) aggravated battery by permanent disfigurement, and (4) home invasion. On January 4, 2013, defense counsel filed a posttrial motion for a new trial.

¶ 19      On January 10, 2013, at the hearing on defense counsel's posttrial motion for a new trial, defendant stated that he was making a *pro se* motion for a new trial based on his trial counsel's ineffective assistance. The notice of service for the *pro se* motion, the *pro se* motion itself, and defendant's affidavit in support of his motion had each been stamped "received" on January 4 but had not been filed with the clerk of the court. The trial court gave defendant leave to file them.

¶ 20      Defendant's *pro se* motion alleged that his trial counsel was ineffective (1) for failing to hold meaningful conferences, (2) for not conducting a proper investigation to find Wanda, who defendant claims was the woman whom Witherspoon observed exiting Witherspoon's apartment and who would have testified that she had a relationship with Witherspoon, (3) for failing to interview the defense investigator, Jane Doe,[1] who previously interviewed Witherspoon, (4) for failing to contact the medical physician who treated defendant's wounds, (5) for failing to investigate the crime scene, (6) for failing to request the trial court to vacate the home invasion count,[2] (7) for failing to file pretrial motions to quash or suppress evidence, (8) for agreeing to the stipulation regarding the ASA, (9) for failing to adequately cross-examine Witherspoon, (10) for failing to adequately cross-examine Officer Ellerbeck, the evidence technician, and (11) for failing to subpoena any of the arresting officers.[3]

---

[1]The investigator was later identified through a last name by defense counsel but no first name was provided.

[2]The trial court vacated defendant's conviction for home invasion prior to sentencing. *Infra* ¶ 33.

[3]One of the arresting officers, John Thill, did testify at trial.

¶ 21        The trial court then questioned defendant about these claims. Defendant claimed that the physician who treated defendant could have impeached Witherspoon's testimony that Witherspoon hit defendant once. The trial court replied, "He said one to two times, but go ahead." Defendant did not provide an affidavit from the physician.

¶ 22        The trial court then asked defendant how defense counsel's investigation of the crime scene would have helped defendant when the photos of the apartment, submitted into evidence, showed the subject area. Defendant claimed that defense counsel would have been able to provide the court, "in the mind's eye," a better measurement of the distances in the apartment and the impossibility of the fight as described by Witherspoon.

¶ 23        The trial court did not address the allegation of failing to vacate the home invasion count, stating that, because defense counsel had not yet made arguments for mitigation in sentencing, the trial court would hold that allegation in abeyance.

¶ 24        The trial court asked defendant to clarify who the investigator, Jane Doe, was. Defendant could not, and defense counsel clarified that defendant was referring to an investigator, Ms. Stewart, who had been asked by defendant's previous public defender to interview Witherspoon. The trial court then asked defendant how the investigator's testimony would have helped defendant's case. Defendant could not remember the specifics from the investigator's interview but claimed that it would have impeached Witherspoon's testimony that Witherspoon and Wanda did not engage in a verbal exchange. Defendant did not produce an affidavit from Investigator Stewart.

¶ 25        The trial court then asked defendant if he had an affidavit from Wanda, which defendant had not obtained. Defendant claimed that Wanda would be able to verify that she invited defendant to the apartment and that defense counsel could have tried to locate her

because defendant had told defense counsel the area that Wanda frequented. Upon questioning by the trial court, defendant was not able to provide Wanda's last name, birth date, or address.

¶ 26       The trial court then asked defendant why he thought the screwdriver recovered by the police from defendant's pocket should have been suppressed. Defendant responded that it could have been challenged because the officer did not feel it during the pat-down search at the crime scene but recovered it later at the police station.

¶ 27       The trial court then asked defendant about his claim to suppress the statement that the ASA would have testified to. Defendant reiterated his claim that he never spoke to an ASA.

¶ 28       Defendant claimed that defense counsel failed to adequately question Witherspoon about an alleged discrepancy concerning the number of people in the "apartment" versus the "residence." Defendant also claimed that defense counsel failed to adequately cross-examine Officer Ellerbeck about his photos of the evidence found at the crime scene. The trial court responded to both claims by observing that defense counsel had cross-examined the witnesses and raised the very same claims regarding credibility that defendant was now claiming were not made.

¶ 29       After the trial court allowed defendant to explain his claims, the trial court asked defense counsel if he would like to respond. Defense counsel responded that he never received any information with which to find Wanda. Defense counsel stated that he vigorously cross-examined witnesses and that he asked defendant at trial if there were any other questions defendant wanted him to ask, and he then asked the witnesses the questions that defendant requested. Defense counsel stated that he had visited the crime scene but was unable to enter the building and that there was not anything he could do about that. Defense

counsel stated that he did not call the physician as a witness because there was nothing the physician could add that was not already in the medical records. Further, defense counsel noted that, in closing arguments, he specifically pointed the trial court's attention to the page of the medical report in the record showing that there were three separate lacerations on defendant's head. Defense counsel noted that he had raised at trial concerns about a discrepancy in Witherspoon's testimony about the number of people in the apartment on January 14, 2010, and the potential problems with the photographs taken by Officer Ellerbeck. Defense counsel stated that he asked Stewart, the defense investigator, to be ready to be called as a witness but that there was nothing in Stewart's interview of Witherspoon that could have been used to impeach Witherspoon. Defense counsel stated that he stipulated only to what the ASA would have testified to but that he had not stipulated to the truthfulness of the statement.

¶ 30 After defense counsel ended his reply, the trial court invited the State to respond. The State noted that defendant's allegations "fly in the face of everything that was done over this multi-day trial." The State argued that defense counsel would not have been able to suppress the screwdriver found on defendant's person because "the officer said he did a patdown [*sic*] and didn't feel it" and the fact that "it was later recovered is not a basis, as Your Honor is well aware, of a motion to quash arrest or suppress evidence." In regard to the stipulation concerning the ASA, the State argued that the statement and defendant's testimony were "generally the same" and that defendant's argument to suppress the ASA's testimony "when he testified to those exact facts flies in the face of common sense." The State noted that Witherspoon's testimony would not have been impeached by Investigator Stewart's

testimony. Citing relevant legal authority,[4] the State then argued that the trial court is not required to appoint new counsel every time a defendant files a *pro se* motion claiming ineffective assistance of counsel and that the court can make a finding either by asking the defendant questions about the claim or by relying on the court's personal knowledge of defense counsel's performance at trial. The State then requested that the trial court deny defendant's *pro se* posttrial motion for a new trial.

¶ 31        The trial court denied defendant's *pro se* motion, stating that it had observed defense counsel asking defendant during trial if there were any more questions to ask witnesses. Defense counsel had then directed defendant's questions to the witnesses. Defense counsel had further "hit the points that should have been hit for your defense." As to Wanda, the trial court observed that defense counsel did not have enough information to find her and there was no proof that she would have corroborated defendant's story. The trial court finished by noting that none of defendant's claims would have affected the outcome at trial. The trial court then denied both posttrial motions.

¶ 32                                    III. Sentencing

¶ 33        On January 22, 2013, the trial court sentenced defendant. First, the court vacated the conviction of home invasion, stating, "And I did review my notes about your arguments, Counsel, about the fact that [defendant] was trying to leave but was stopped by Mr. Witherspoon. So I am going to revisit that issue and vacate my finding of Count 1, the home invasion, based on my reading of that ruling." During the aggravation phase of sentencing, the trial court considered defendant's burglary conviction on September 23, 2003, and defendant's eight burglary convictions on October 13, 2006. On January 14, 2010, the date of

---

[4]The relevant legal authority is discussed later in this opinion. *Infra* ¶¶ 83-84.

the offense, defendant was still on mandatory supervised release for eight burglary convictions from October 13, 2006. All nine prior convictions were Class 2 offenses. As a result of the prior convictions, and the violent nature of this residential burglary, defendant was sentenced as a Class X offender. Defendant stated that he had reviewed the presentencing investigation report, and the defense did not object to the prior convictions. The trial court considered that defendant caused serious bodily harm to Witherspoon and that the trial court had observed at trial how this bodily harm caused Witherspoon to suffer a speech impediment. Furthermore, the injury caused Witherspoon severe pain, and Witherspoon's lip would, on occasion, become discolored and peel. In mitigation, defense counsel stated that defendant's mother had died at a young age, that defendant's father was not involved in his life and that, as a result, defendant had to take care of himself from a young age. Defense also noted that defendant had been employed for the past 10 years.

¶ 34 On the count of residential burglary, the trial court sentenced defendant to 30 years in IDOC, followed by 3 years of mandatory supervised release. On the count of aggravated battery by great bodily harm, the trial court sentenced defendant to a seven-year extended term sentence, to run concurrently.[5] On the same day, the trial court denied defendant's motion to reconsider sentence. The trial court granted defendant a credit of $5 per day for the 1104 days defendant was in custody. The trial court calculated the fines and fees as totaling $445 and stated, "I will give you credit of $5 a day toward each day you serve [*sic*] toward those fines." The direct appeal followed, which led, as we already described, to a remand for a new preliminary *Krankel* hearing before a different trial judge. *Supra* ¶¶ 3-4.

---

[5]The trial court did not state that it was merging the count of aggravated battery by permanent disfigurement into the count of aggravated battery by great bodily harm. However, the mittimus reflects only convictions and sentences for (1) residential burglary and (2) aggravated battery by great bodily harm.

¶ 35                                    IV. New Preliminary *Krankel* Hearing

¶ 36            On April 19, 2016, a new preliminary *Krankel* hearing was held before a different

trial judge. At the start, the trial court stated that it had reviewed defendant's *pro se* motion,

filed January 14, 2013, and that both defendant and the court had copies of it in front of

them. The trial court then asked defendant about each of his claims in turn, as we detail

below.

¶ 37                                    A. Counsel's Conferences With Defendant

¶ 38            The trial court noted that, in his motion, defendant claimed that his attorney failed to

hold any meaningful conferences with him. Defendant responded that he had informed the

prior trial judge "early on" that his family could no longer afford to pay defendant's privately

retained counsel, and that the prior trial judge had "ignored that issue." As a result of the lack

of payment, defendant believed that his counsel had no "incentive to help [defendant] the

best he could." The trial court asked whether counsel had said "anything to that effect," and

defendant responded, "I can't say that he did." Nonetheless, it was "a feeling" defendant had,

because his counsel always said that he had left his file somewhere else, in his vehicle or in

his home, when he came to visit defendant. Defendant stated that his counsel visited him

three or four times in jail, but would then say that he did not have his file and would see

defendant in court. On court dates, counsel would simply inform defendant that he had

obtained a continuance.

¶ 39                                    B. Locating Wanda

¶ 40            In addition to failing to hold meaningful conferences, defendant claimed that his

counsel did not attempt to locate Wanda. Defendant stated that he asked his counsel to find

Wanda and, specifically, to speak to the manager of the restaurant where defendant worked and which Wanda frequented. Defendant stated, "Yeah, the restaurant, yes, sir. And he never went. I have an affidavit from them saying that they was waiting on him to come, but he never came." Defendant explained that the restaurant had "been there over 25 years" and "[t]hey know everybody from the surrounding neighborhood."

¶ 41 Defendant stated that he was "in contact with the people at the restaurant" regarding Wanda and "they say the only thing they knew [was] that she stayed between 46 and 47th" Streets and Indiana Avenue. However, they did not know her last name. Defendant stated that, closer to the time of the offense, "we had a better chance of trying to find her."

¶ 42 Defendant stated that he asked his sister, who is not from the same neighborhood and is from the suburbs, to go to the restaurant and talk to them. His sister went and asked defendant's manager, but she was not able to obtain a last name or address for Wanda. Defendant argued that his counsel "never even tried to go out there," and Wanda was "basically key to [defendant's] whole case." Defendant argued that Wanda's testimony would have been that she had "some kind of relationship" with Witherspoon and "[i]t wasn't no we just broke in here." When the trial court pointed out that Wanda fled, defendant responded that Witherspoon "pulled out his gun, now she's gone."

¶ 43 Defendant claimed later at the inquiry that his counsel stated, "I did not go out and investigate because, quite frankly, I don't think she exists." Then defendant argued, "How can you be an attorney and take a case [where] you don't believe in your client. That is not possible."

¶ 44                                  C. Public Defender's Investigator

¶ 45                                  1. Witherspoon's Question to Wanda

¶ 46 Defendant also claimed that his counsel failed to subpoena an investigator who had been asked by defendant's prior counsel, an assistant public defender, to interview Witherspoon. Defendant argued that "the statement that [Witherspoon] gave [the investigator] and the testimony that he gave at trial, even from the police reports and preliminary hearing, they were all different." The trial court asked, "Didn't your lawyer *** have [the investigator] under subpoena in *** case *** Mr. Witherspoon testified contrary to his interview with her? Isn't that what the strategy was?" Defendant agreed that was the strategy. However, defendant believed that Witherspoon "did testify contrary," while his counsel believed that it was not contrary. As an example of a contradiction, defendant stated that Witherspoon testified at trial that he did not say anything to the woman exiting his apartment, whereas to the investigator Witherspoon stated that he asked the woman where she was going.

¶ 47                                   2. A Third Man

¶ 48 Defendant also argued that there was a discrepancy between the investigator's report and Witherspoon's trial testimony as to how many people were in his apartment. However, defendant acknowledged that his counsel brought out that discrepancy by relying on Witherspoon's testimony at the preliminary hearing rather than Witherspoon's statement to the investigator.

¶ 49 During cross-examination at trial, defense counsel tried to impeach Witherspoon's trial testimony that there were only two people inside his apartment, noting Witherspoon's prior testimony at a preliminary hearing that there were three people inside his "residence": defendant, the woman, and a "lookout guy." Upon further questioning, Witherspoon

explained that defendant and the woman were in Witherspoon's apartment, while a possible male "lookout" was standing immediately outside of the building.

¶ 50                                D. Defendant's Treating Physicians

¶ 51         Defendant also claimed that his counsel failed to contact defendant's treating physicians. Defendant explained that the purpose of calling the physicians was to describe defendant's injuries and to specify how he sustained them. Defendant stated that he received three different injuries in three different locations. The trial court asked, "Isn't that what your attorney argued though, that Witherspoon hit you more than once; right?" Defendant acknowledged that his counsel argued that, but defendant responded that the State had alleged that defendant's injuries were sustained when he and Witherspoon tumbled down carpeted stairs. Defendant argued that a doctor's "professional opinion on how this [*sic*] injuries was sustained" would have supported his argument that the injuries were the result of blows by a blunt object rather than the result of a fall down carpeted stairs.

¶ 52         The trial court reminded defendant that his counsel admitted his medical records in evidence, which included a diagram of the patient showing three injuries to the head, and that his counsel argued that these injuries were inconsistent with the State's theory of a fall down the stairs. Defendant responded that counsel's argument would have been more effective if there had been testimony from "a medical professional there who say, look, I've been in this field for many years, this injury didn't happen from a fall down some stairs."

¶ 53                                E. Apartment Visit

¶ 54         Defendant also claimed that his counsel was ineffective for failing to visit Witherspoon's apartment. Defendant admitted that there were photos of the areas where the confrontation occurred that were taken shortly after the incident. However, defendant argued

that measurements would have showed the impossibility of the fight as described by Witherspoon. Defendant stated that Witherspoon was 6 feet, 7 inches tall, and the area was 3 feet by 3 feet. Defendant argued that it was impossible for "me and him wailing around in this 3 feet by 3 feet area for ten minutes, and nothing gets knocked over." Defendant stated that "actual measurements" would have bolstered his case.

¶ 55    The trial court then examined the photographs that had been introduced into evidence at trial and observed that they "show exactly what the space looked like after the altercation" and "the relative position of the furniture in the room, the proximity to the walls, the door." The court then asked defendant if his position was "that actual measurements, feet and inches, would be more persuasive." Defendant stressed how tall Witherspoon was, and the trial court observed that Witherspoon had been in court during the trial, thus implying that the original trial court was well aware of his height.

¶ 56                                F. Suppression Motions

¶ 57    Defendant claimed that his counsel failed to file a pretrial motion to suppress a screwdriver in defendant's pocket. When the trial court asked defendant for the "legal basis that you envisioned for filing a motion to quash that screwdriver," defendant explained that the basis was the length of time that he had been in custody before the police claimed to have found it.

¶ 58    Defendant also claimed that his attorney failed to file a motion to suppress a statement by him to the ASA, on the ground that it was never made. The trial court responded that his counsel did not stipulate to the truth of the statement but rather that, if called, this would be the ASA's testimony. Defendant replied that his counsel did not even ask him whether he had made the statement before stipulating.

¶ 59                                    G. Cross-Examination

¶ 60          Defendant claimed that his counsel failed to adequately cross-examine Witherspoon, the victim. The trial court asked, "you conferred with him *** about questions to ask Mr. Witherspoon; is that accurate?" Defendant agreed and stated, "These questions was more or less to remind [defense counsel] about the inconsistencies between the police report, investigative report, and the testimony [Witherspoon] was giving and the preliminary hearing." The court observed that his counsel's cross-examination concerned "the layout of the apartment, the size of Mr. Witherspoon, your size, how long the fight went, and the undisturbed furniture," and defendant replied, "[c]orrect."

¶ 61          Defendant also claimed that his counsel failed to adequately cross-examine Ellerbeck, the evidence technician, with respect to pry marks on the victim's apartment door, particularly about the lack of shavings on the carpet below the door. When the trial court observed that his counsel did bring out the lack of shavings on cross, defendant responded that he was "not sure we asked about the shavings."[6]

¶ 62                                    H. Arresting Officers

¶ 63          Defendant also claimed that his counsel failed to call or subpoena the arresting officers,[7] who could have impeached the evidence technician and also Witherspoon, concerning where items were when the officers arrived. The trial court then observed that the layout was established by a photograph that his counsel introduced into evidence. Defendant then stated that there were inconsistencies in Witherspoon's accounts, namely: Witherspoon's preliminary hearing testimony, the police report, and his trial testimony all

_____

[6]In fact, Ellerbeck testified on direct that he observed pry marks on the apartment door and photographed them; and then, on cross, he admitted that he did not observe any wood shavings on the floor near the door.

[7]As we already observed, one of the arresting officers, John Thill, did testify at trial.

indicated that defendant was the only person in the living room, whereas the defense investigator's report indicated that Wanda and defendant were exiting the apartment door and Wanda was heading down the stairs.

¶ 64                                    I. Defense Counsel's Response

¶ 65          Defendant's trial counsel was present for the inquiry and responded, as follows to each of the issues raised above. First, with respect to communication, counsel stated that he met three times with defendant in jail, bringing his "travel file" rather than the entire "30-pound file." In addition, they also met on court dates, and defendant "called the office on dozens of occasions" and spoke with counsel's associate.

¶ 66          Second, with respect to Wanda, counsel stated, "Wanda was a phantom. [Defendant] had no information on Wanda other than her name ***No date of birth. No where she hung out. I don't even know if there is a Wanda, Judge. *** He never told me to talk to anybody at the restaurant about Wanda. *** He wasn't even sure that was her real name."

¶ 67          Third, with respect to the public defender's investigator, counsel stated that he had subpoenaed her, and she was present in the hall outside the courtroom. However, Witherspoon's trial testimony was consistent with his statement to the investigator so there was no point in calling her. Counsel tried to impeach Witherspoon with his preliminary hearing transcript, and there was much discussion at trial about the meaning of the words "residence" versus "apartment" and about whether there was a possible lookout outside the building. However, Witherspoon's trial testimony was consistent with his statement to the investigator.

¶ 68          Fourth, as to defendant's treating physician, counsel stated that, in his experience, physicians are "usually reluctant to give opinions as to how an injury was sustained unless

it's a gunshot wound." Thus, "as a strategic point," counsel thought it was better to rely on defendant's medical records, which showed three distinct injuries, since Witherspoon testified that he hit defendant once.

¶ 69     Fifth, as to the lack of an apartment visit, counsel stated that the photographs showed what a "confined area" there was for "a wrestling match" and the fact that items were undisturbed, thus impeaching Witherspoon's trial testimony about the plausibility of a fight taking place in the living room. In addition, counsel did visit the building, but he was not able to enter it.

¶ 70     Sixth, as to the lack of suppression motions, counsel explained his strategy. With respect to stipulating to the ASA's testimony, counsel stated that he stipulated as to what she would say, not as to whether it was true; and counsel believed that it would be "less painful to put it in as a paper transcript than to have her actually get on the stand and say this is what happened." Prior to stipulating, counsel spoke to both defendant and the ASA. In addition, counsel believed that defendant's statement to the ASA "wasn't really an incriminating statement. It was pretty much what he testified to on the stand." With respect to the screwdriver found in defendant's pocket, counsel did not believe there was a basis for a suppression motion.

¶ 71     Seventh, with respect to the cross-examination of Witherspoon, counsel stated that he vigorously cross-examined Witherspoon concerning some minor discrepancies but that Witherspoon's accounts were fairly consistent. With respect to the cross-examination of Ellerbeck, the evidence technician, counsel believed that he thoroughly cross-examined him about the differences among photographs and whether the technician had moved items.

¶ 72    Lastly, with respect to not calling the arresting officers, counsel stated that he had been a defense lawyer for 32 years and that his experience showed that "members of the Chicago Police Department, as much I respect them, are not usually all that willing to try to help the defense out in a case." In addition, "[i]t did not seem like they had anything to add" because they arrived "after the fact."

¶ 73                              J. Trial Court's Ruling

¶ 74    After hearing from both defendant and his counsel, the trial court denied defendant's *Krankel* motion for new counsel, stating that it "is really clear to me that the trial proceeded just as you and [counsel] intended, for you to get up and tell that story and explain that Wanda gave you the right to be there and that Mr. Witherspoon overreacted with beating you on the back of the head, and you bit his lip off."

¶ 75    The trial court found that all the "points of impeachment" that defendant sought, such as "the lack of disruption inside the apartment" and "the three cuts on the back of [his] head," were brought out by counsel. Counsel's "trial strategy to temper the State's Attorney's testimony by stipulating to it rather than hav[ing] her come to the courtroom and testify seemed sound to" the trial court. In sum, the trial court found that defendant "was well represented" and that his allegations were "without merit."

¶ 76    After the trial court denied defendant's motion for new counsel, defendant filed a timely notice of appeal, and this appeal followed.

¶ 77                                  ANALYSIS

¶ 78    On this appeal, defendant claims (1) that the trial court should have appointed counsel after the new preliminary *Krankel* inquiry and (2) that defendant's fines and fees order must be corrected again. The State agrees that the fines and fees order should be corrected, and we

21

so order it, as we detail below. However, we do not find defendant's *Krankel* arguments persuasive and thus affirm his conviction and sentence.

¶ 79                                    I. Defendant's *Krankel* Claim

¶ 80        Defendant claims that the trial court erred by not appointing new counsel because, at the new preliminary *Krankel* inquiry, defendant "show[ed] possible neglect of the case." *People v. Moore*, 207 Ill. 2d 68, 78 (2003).

¶ 81                                    A. *Krankel* and Related Precedent

¶ 82        Through *People v. Krankel* and its progeny, the Illinois Supreme Court has provided our trial courts with a clear blueprint for handling posttrial *pro se* claims of ineffective assistance of counsel. *People v. Ayres*, 2017 IL 120071, ¶¶ 1, 11; *Moore*, 207 Ill. 2d at 77-82 (discussing *Krankel* and its progeny); *People v. Chapman*, 194 Ill. 2d 186, 227-31 (2000) (same); *People v. Johnson*, 159 Ill. 2d 97, 124 (1994) (same).

¶ 83        A trial court is not automatically required to appoint new counsel any time a defendant claims ineffective assistance of counsel. *Ayres*, 2017 IL 120071, ¶ 11; *People v. Jolly*, 2014 IL 117142, ¶ 29; *Moore*, 207 Ill. 2d at 77; *Chapman*, 194 Ill. 2d at 230; *Johnson*, 159 Ill. 2d at 124; *People v. Nitz*, 143 Ill. 2d 82, 134 (1991). Instead, the trial court must first conduct a preliminary inquiry to examine the factual basis underlying a defendant's claim. *Ayres*, 2017 IL 120071, ¶¶ 11, 24; *Moore*, 207 Ill. 2d at 77-78; *Chapman*, 194 Ill. 2d at 230; *Johnson*, 159 Ill. 2d at 124; *Nitz*, 143 Ill. 2d at 134.

¶ 84        A trial court may base its preliminary *Krankel* decision on (1) the trial counsel's answers and explanations, (2) a "brief discussion between the trial court and the defendant," or (3) "its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79. See also *Ayres*, 2017 IL

120071, ¶ 12; *Jolly*, 2014 IL 117142, ¶ 30; *Chapman*, 194 Ill. 2d at 228-31; *People v. Tolefree*; 2011 IL App (1st) 100689, ¶ 22; *People v. Peacock*, 359 Ill. App. 3d 326, 339 (2005). "If [a] trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Moore*, 207 Ill. 2d at 78. See also *Ayres*, 2017 IL 120071, ¶ 11; *Jolly*, 2014 IL 117142, ¶ 29; *Chapman*, 194 Ill. 2d at 230; *Johnson*, 159 Ill. 2d at 124. A claim lacks merit if it is " ' "conclusory, misleading, or legally immaterial" or do[es] "not bring to the trial court's attention a colorable claim of ineffective assistance of counsel." ' " *Tolefree*, 2011 IL App (1st) 100689, ¶ 22 (quoting *People v. Burks*, 343 Ill. App. 3d 765, 774 (2003), quoting *Johnson*, 159 Ill. 2d at 126).

¶ 85    However, if a defendant's claims "show possible neglect of the case," the trial court must appoint new counsel. *Moore*, 207 Ill. 2d at 78. See also *Ayres*, 2017 IL 120071, ¶ 11; *Jolly*, 2014 IL 117142, ¶ 29; *People v. Ramey*, 152 Ill. 2d 41, 52 (1992); *Chapman*, 194 Ill. 2d at 230; *Johnson*, 159 Ill. 2d at 124. The claim then proceeds to "the second stage of the *Krankel* proceeding" (*Jolly*, 2014 IL 117142, ¶ 44), when defendant is represented by new counsel at an "evidentiary hearing." *Jolly*, 2014 IL 117142, ¶¶ 43-44; *Moore*, 207 Ill. 2d at 78 ("The new counsel would then represent the defendant at the hearing on the defendant's *pro se* claim of ineffective assistance."). "The appointed counsel can independently evaluate the defendant's claim and would avoid the conflict of interest that trial counsel would experience if trial counsel had to justify his or her actions contrary to defendant's position." *Moore*, 207 Ill. 2d at 78.

¶ 86                              B. Standard of Review

¶ 87       On appeal, our standard of review for *Krankel* claims varies, depending on whether the trial court employed the proper procedure and whether it made a determination on the merits. *Tolefree*, 2011 IL App (1st) 100689, ¶ 25.

¶ 88       We review *de novo* the procedure the trial court used to conduct the preliminary *Krankel* inquiry. *Jolly*, 2014 IL 117142, ¶ 28; *Moore*, 207 Ill. 2d at 75. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)). If we find that the trial court committed an error in procedure, we will reverse the outcome of the inquiry, unless the error was harmless beyond a reasonable doubt. *Jolly*, 2014 IL 117142, ¶ 40; *Moore*, 207 Ill. 2d at 80. Thus, for example, our supreme court in *Jolly* reversed the outcome of a preliminary *Krankel* inquiry, where the trial court allowed the State to participate in it, because the trial court's "error in this case" was not "harmless beyond a reasonable doubt." *Jolly*, 2014 IL 117142, ¶ 40. Similarly, we did the same in the case at bar when we remanded for a new preliminary *Krankel* inquiry. *Robinson*, 2015 IL App (1st) 130837, ¶¶ 81-83.

¶ 89       On this appeal, defendant does not allege a procedural error but instead claims that, after conducting the preliminary inquiry, the trial court should have appointed new counsel and failed to do so. If a trial court should have appointed new counsel and failed to do so, we will reverse the trial court's *Krankel* ruling unless the error was harmless beyond a reasonable doubt. *Moore*, 207 Ill. 2d at 80 ("A trial court's failure to appoint new counsel to argue a defendant's *pro se* posttrial motion claiming ineffective assistance of counsel can be harmless beyond a reasonable doubt."); *Nitz*, 143 Ill. 2d at 135 ("we agree with the State that the trial court's failure to appoint new counsel was harmless beyond a reasonable doubt").

¶ 90        However, if the trial court properly conducted the entire *Krankel* inquiry and reached a determination on the merits, we will reverse only if the trial court's action was manifestly erroneous. See *Tolefree*, 2011 IL App (1st) 100689, ¶ 25; *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008). " 'Manifest error' is error that is clearly plain, evident, and indisputable." *Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)).

¶ 91                             C. *Strickland* and Ineffectiveness of Counsel

¶ 92        In his *pro se* posttrial motion, defendant claimed that his trial counsel was ineffective.

¶ 93        Both the United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel. *People v. Hale*, 2013 IL 113140, ¶ 15 (citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. 1, § 8). In determining whether defendant was denied effective assistance of counsel, we apply the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504 (1984). *People v. Cherry*, 2016 IL 118728, ¶ 24. Under the *Strickland* test, a defendant must show both that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Cherry*, 2016 IL 117934, ¶ 24. Since a defendant must satisfy both prongs of the *Strickland* test, the failure to establish either prong bars his claim. *People v. Peterson*, 2017 IL 120331, ¶ 79; *Cherry*, 2016 IL 118728, ¶ 24.

¶ 94        As for the first prong in a claim of ineffectiveness, counsel's performance "must be evaluated based on the entire record." *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 114; *People v. Flores*, 128 Ill. 2d 66, 107 (1989) ("[C]ounsel's performance must be evaluated on

the basis of the entire record, and not upon isolated instances of alleged incompetence called into question by the defendant."). As we explain below, based on our evaluation of the entire record including the new preliminary *Krankel* inquiry, we find that counsel's performance was objectively reasonable.

¶ 95                               D. The Trial Court's *Krankel* Inquiry

¶ 96        Although defendant argued a number of instances of alleged neglect at the *Krankel* inquiry, on appeal defendant raises only two: (1) that his trial counsel failed to look for Wanda, the woman whom defendant testified led him into the victim's apartment; and (2) that his trial counsel failed to interview the arresting officers concerning whether Witherspoon, the victim, referred to Wanda by name when relating to them what happened immediately after the offense. Defendant argues that, if his trial counsel had located Wanda, she would have corroborated his testimony and that, if Witherspoon had used Wanda's name, his knowledge of her name would have impeached Witherspoon's testimony that he did not know the woman leaving his apartment. For the following reasons, we do not find defendant's arguments persuasive.

¶ 97                                    1. Looking for Wanda

¶ 98        Defendant argues, first and foremost, that his counsel showed neglect of his case by not making any attempt to locate Wanda.

¶ 99        A defense counsel has a professional duty to conduct a reasonable investigation or make a reasonable decision that a particular investigation is not necessary. *People v. Domagala*, 2013 IL 113688, ¶ 38. However, any lack of investigation is judged against a standard of reasonableness, given "all the circumstances" and "applying a heavy measure of

26

deference to counsel's judgments." (Internal quotation marks omitted.) *People v. Guest*, 166 Ill. 2d 381, 400 (1995); *People v. Viramontes*, 2017 IL App (1st) 160984, ¶ 56.

¶ 100     In the case at bar, there is no question that there *was* a woman with defendant during the offense. Both defendant and Witherspoon, the victim, agreed on that fact during their respective trial testimony. There is also no question that she fled the scene, apparently never to be heard from again by anyone involved in this case.

¶ 101     At the *Krankel* inquiry, defendant claimed that he asked his counsel to look for Wanda and, specifically, to speak to the manager of the restaurant where defendant had worked and that Wanda frequented. By contrast, counsel denied that defendant had asked him to talk to someone at the restaurant. However, defendant admitted that his sister had visited the restaurant but was still unable to obtain a last name or address for Wanda.

¶ 102     At the inquiry, defendant admitted that the only information that he had for Wanda was her first name, a physical description, and that "she stayed between 46th and 47th Streets and Indiana Avenue." Counsel denied that defendant informed him where Wanda "hung out." However, both defendant and counsel agreed that they lacked Wanda's last name, address, or date of birth.

¶ 103     Defendant argued, not only that Wanda would have testified, but that she would have corroborated his testimony by admitting to removing items from Witherspoon's apartment and to having had a relationship with Witherspoon. However, as even defendant observed at the *Krankel* inquiry, Witherspoon "pulled out his gun, now she's gone." Whether due to Witherspoon's gun or the possibility of criminal charges or both, her headlong flight is undisputed.

¶ 104    In light of the paucity of information that counsel had about Wanda, her headlong flight from the scene, and her incentives not to be found, we cannot find, given all the circumstances, that counsel's decision not to investigate further was unreasonable or showed possible neglect of the case. See *Guest*, 166 Ill. 2d at 400.

¶ 105                              2. Interviewing Arresting Officers

¶ 106    Second, defendant argues that his trial counsel was ineffective by failing to interview the arresting officers about whether Witherspoon, the victim, used Wanda's name when relating to them what happened immediately after the offense.

¶ 107    As we noted above, defense counsel has a duty to conduct a reasonable investigation or make a reasonable decision that investigation is not necessary (*Domagala*, 2013 IL 113688, ¶ 38), and any lack of investigation is judged against a standard of reasonableness. *Guest*, 166 Ill. 2d at 400; *Viramontes*, 2017 IL App (1st) 160984, ¶ 56.

¶ 108    In addition, "the decision whether to call a certain witness for the defense is a matter of trial strategy, left to the discretion of counsel after consultation with the defendant." *Peterson*, 2017 IL 120331, ¶ 80. As a result, "such decisions will not ordinarily support a claim of ineffective assistance of counsel." *Peterson*, 2017 IL 120331, ¶ 80. Even "a mistake in trial strategy" will not, by itself, "render representation constitutionally defective." *Peterson*, 2017 IL 120331, ¶ 80. However, at this stage, we are considering *not* whether defendant's claim rises to a level of constitutional defectiveness, but *only* whether defendant's claim showed "possible neglect of the case," thus necessitating appointment of new counsel for a second-stage *Krankel* inquiry. *Moore*, 207 Ill. 2d at 78.

¶ 109    Defendant argues, based on the police report, that Witherspoon may have used the name "Wanda" with the arresting officers. The police report stated, in relevant part:

28

"This is an arrest by the Second District Tact Team *** responding to a call of 'Man Shot'[.] Arrived to discover Ryishie Robinson (offender) lying in the doorway of apt. building with the glass of building door shattered and Eugene Witherspoon (victim and complainant) lying on stairs leading to 2nd fl residence bleeding from the face. Eugene Witherspoon (victim and complainant) related that he is building manager and was working security for building owner when he went outside of building to inspect for possible security camera locations. *Victim related* that when he went back into building, *he discovered Ryshie Robinson (offender) and 'Wanda' Unk (offender)* leaving his residence through the front door with property belonging to him and his wife (Mary Johnson (victim and complainant). When Eugene Witherspoon (victim and complainant) confronted offenders, Ryshie Robinson (offender) began to fight victim in an attempt to escape. During the struggle with offender, Eugene Witherspoon (victim and complainant) was bit on the lower lip by Ryshie Robinson (offender) removing a large piece of lip. Victim then produced a handgun which discharged and shattered the front door glass. 'Wanda' Unk (offender) made good her escape[.]" (Emphases added.)

The police report was authored by Officer John Sonley, while the arresting officer who testified at trial was his partner, Officer John Trill.

¶ 110    Based on the above quote, defendant argues that Witherspoon may have "related" to the officers that the woman's name was Wanda, thereby indicating that he knew her, which would contradict his trial testimony.

¶ 111    However, the above quote does not suggest that Witherspoon knew Wanda, any more than it suggests that he knew defendant. Although the report states that the "Victim related,"

29

it then states defendant's full name, which no one claims that Witherspoon knew prior to the offense. If we were to take the above report as evidence that Witherspoon may have known Wanda's name, then we would have to accept, by the same logic, that he knew defendant's full name and that he "related" to the officers that Wanda was also "Unk" or unknown.

¶ 112 At the *Krankel* inquiry, defense counsel explained that he made a strategic decision not to call the arresting officers at trial because officers are "not usually all that willing to try to help the defense out" and "[i]t did not seem like they had anything to add." We do not find persuasive defendant's argument that the above-quoted report shows possible neglect by counsel of the case.

¶ 113 If defendant produced an affidavit from an officer that he recalled Witherspoon providing the name, that could make a difference. Anything less than that would be a " 'fishing expedition.' " *People v. Malone*, 2017 IL App (3d) 140165, ¶ 10. " '[T]here is no showing of the existence of any facts or evidence on which such affidavits could have been founded. Absent a showing of available material for supporting affidavits, a failure to present affidavits obviously cannot be considered a neglect by the attorney.' [Citation.] Counsel is not required to go on a 'fishing expedition' to find facts and evidence outside the record that might support the defendant's claims." *Malone*, 2017 IL App (3d) 140165, ¶ 10.

¶ 114                                        II. Defendant's Fines-and-Fees Claims

¶ 115 Defendant claims that the fines and fees order must be corrected again, and the State agrees.

¶ 116 In our prior opinion, we observed that defendant received a credit of $5 a day for the 1104 days he was incarcerated while awaiting trial, and that this credit should have been applied to the $50 in fines reflected in the "Order Assessing Fines, Fees, and Costs."

*Robinson*, 2015 IL App (1st) 130837, ¶ 115. We also observed that the trial court incorrectly applied a $5 electronic citation fee, which should have been removed. *Robinson*, 2015 IL App (1st) 130837, ¶ 115; 705 ILCS 105/27.3e (West 2012) (electronic citation fee applies only to "traffic, misdemeanor, municipal ordinance, or conservation case[s]"). Finally, the initial calculation of the fines and fees showed $370 in fees and costs and $50 in fines, which comes to a total of $420. However, the order listed a total of $445 owed by defendant instead of $420. After removing the $5 electronic citation fee, applying defendant's credit to the fines, and correctly adding the fines and fees, our prior opinion found that the total amount of fines and fees due from defendant should be $365. *Robinson*, 2015 IL App (1st) 130837, ¶ 115. The State agreed with this calculation, and we corrected the original "Order Assessing Fines, Fees, and Costs" to reflect that the fines and fees due from defendant was $365 rather than $445.

¶ 117    On this appeal, defendant claims, and the State does not dispute, that the amount owed by defendant is only $285, not $365 as ordered in our prior opinion. *Robinson*, 2015 IL App (1st) 130837, ¶ 115. Defendant claims that upon remand, the trial court made the corrections that this court ordered. However, the trial court also imposed an additional $20 violent crime victims assistance fine and an additional $100 violent crime victims assistance fine, neither of which were imposed when defendant was initially sentenced on January 22, 2013, and both of which were not authorized by the statutes in effect on the date of the offense. Additionally, defendant claims that he is entitled to a $5 per day presentence custody credit against both his $15 State Police operations fine and his $50 court system fine. Thus, defendant argues that this court should vacate the improperly imposed fines and offset the

remaining fines by his *per diem* credit, thus reducing the total amount that he owes to $285. For the following reasons, we agree.

¶ 118                    A. Violent Crime Victims Assistance Fine

¶ 119                              1. $20 Fine

¶ 120        On remand, defendant was assessed a $20 Violent Crime Victims Assistance Fund fine under section 10 of the Violent Crime Victims Assistance Act (Act) (725 ILCS 240/10(c)(1), (2) (West 2010).[8] The preprinted form used by the trial court on remand was entitled "Order Assessing Fines, Fees and Costs" and it stated, in relevant part, "Violent Crime Victim Assistance, 725 ILCS 240/10/(c)(1) or (2) *where no other fine is imposed.*" (Emphasis added.) Next to this preprinted line was a handwritten notation of "$20."

¶ 121        Defendant is correct that he cannot be assessed this $20 fine under the version of the statute in effect on January 14, 2010, the date of the offense. 725 ILCS 240/10(c)(1), (2) (West 2010). Section 10 then stated in relevant part:

> "When any person is convicted in Illinois on or after August 28, 1986, of an offense listed below, or placed on supervision for such an offense on or after September 18, 1986, and *no other fine is imposed*, the following penalty shall be collected by the Circuit Court Clerk:
>
>        (1) $25, for any crime of violence as defined in subsection (c) of Section 2 of the Crime Victims Compensation Act; and

---

[8]The 2010 Illinois Compiled Statutes contains the version of section as amended effective January 1, 2010, which is two weeks before the offense date. Thus, this is the version that applies.

(2) $20, for any other felony or misdemeanor, excluding any conservation

offense." (Emphasis added.) 725 ILCS 240/10(c)(1), (2) (West 2010).[9]

Since defendant was assessed other fines, such as the $10 mental health court fine, the $5

youth/peer Court fine, the $5 drug court fine, and the children's advocacy center fine, the

above-quoted section did not authorize the imposition of a $20 fine. See *People v. Jamison*,

229 Ill. 2d 184, 191 (2008) ("Section 10(c) of the Act provides for a 'penalty' to be collected

when '*no other fine is imposed*.' " (Emphasis added.) (quoting 725 ILCS 240/10(c) (West

2004))).

¶ 122     The State agrees that this $20 fine must be vacated, and we hereby order it vacated.

¶ 123                                        2. $100 Fine

¶ 124     In addition, defendant argues that, on January 14, 2010, the date of his offense, the

subsection authorizing the $100 Violent Crime Victims Assistance Fund fine did not yet

exist. On remand, the trial court imposed the $100 fine pursuant to section 10(b) of the Act

which stated, in relevant part:

    "(b) When any person is convicted in Illinois of an offense listed below, or placed on

    supervision for that offense on or after July 1, 2012, the court shall impose the

    following fines:

    (1) $100 for any felony [.]" 725 ILCS 240/10(b)(1) (West 2012).

---

[9]In addition, defendant could not be assessed this fine under the version of the statute in effect at the time of either his original sentencing or the remand to the trial court. The provision for this $20 fine was eliminated altogether by the time of defendant's initial sentencing on January 22, 2013 (725 ILCS 240/10 (West 2012)), and it similarly did not exist at the time the trial court entered the fines and fees order on remand on January 7, 2016 (725 ILCS 240/10 (West 2016)).

¶ 125        Defendant argues, and the State agrees, that since the legislature did not add this $100 fine to section (b) of the statute until years after his offense, *ex post facto* considerations prohibit its imposition.

¶ 126        Both the United States Constitution and the Illinois Constitution prohibit the enactment of *ex post facto* laws. U.S. Const., art. I, § 9; Ill. Const. 1970, art. I, § 16. A criminal law violates this prohibition if a legislative change is retroactively applied to a criminal defendant, and it " 'alters the definition of criminal conduct or increases the penalty by which a crime is punishable.' " *Hadley v. Montes*, 379 Ill. App. 3d 405, 409 (2008) (quoting *California Department of Corrections v. Morales*, 514 U.S. 499, 506 n.3 (1995)). It is well established that fines are subject to the prohibition against *ex post facto* laws. *People v. Dalton*, 406 Ill. App. 3d 158, 163-64 (2010); *People v. Prince*, 371 Ill. App. 3d 878, 880 (2007); *People v. Bishop*, 354 Ill. App. 3d 549, 561-62 (2004).

¶ 127        In addition, "[t]he imposition of a fine that does not become effective until after a defendant commits an offense violates *ex post facto* principles." *People v. Devine*, 2012 IL App (4th) 101028, ¶ 10. See also *People v. Smith*, 2014 IL App (4th) 121118, ¶ 61 (since a "fine took effect on January 1, 2010, after the date of defendant's offense, *** [its] imposition would violate the prohibition against *ex post facto* laws"). In the case at bar, section 10, quoted above, was amended by Public Act 97-816 to increase the fine to $100, effective July 16, 2012. See Pub. Act 97-816 (eff. July 16, 2012) (amending 725 ILCS 240/10). By contrast, defendant's offense occurred over two years earlier on January 14, 2010. Accordingly, we vacate the trial court's imposition of this $100 fine.

¶ 128               B. Presentencing Credit Applied to Fines

¶ 129          Defendant's next claim is that the trial court failed to apply his presentencing credit to two fines that should have been offset by it. A defendant is entitled to a credit against his fines of $5 for each day he spent incarcerated prior to sentencing. 725 ILCS 5/110-14(a) (West 2010). At defendant's sentencing on January 22, 2013, the trial court found that defendant was entitled to a total credit of 1104 days, and $5 times 1104 results in a presentencing credit of $5520.

¶ 130          On remand, the preprinted form, utilized by the trial court, stated that the following fines were to be offset: (1) the $10 mental health court fine, (2) the $5 drug court fine, (3) the $5 youth diversion/peer court fine, and (4) the $30 children's advocacy center fine. These four fines totaled $50.

¶ 131          On this appeal, defendant argues, in addition, that the $15 State Police operations fee (705 ILCS 105/27.3a(1.5) (West 2010)) and the $50 court systems fee (55 ILCS 5/5-1101(c)(1) (West 2010)) are actually *fines*, and are therefore also subject to the $5 *per diem* offset. This would result in an additional $65 offset, for a total offset of $65 plus $50, or $115. On the preprinted form, these two charges appear under a heading that states, "Fees and Costs *Not* Offset by the $5 per-day pre-sentence incarceration credit."

¶ 132          Under section 110-14 of the Code of Criminal Procedure of 1963, the presentencing credit applies only against fines. Section 110-14 states:

                    "(a) Any person incarcerated on a bailable offense who does not supply bail and against whom *a fine* is levied on conviction of such offense shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant. However, in no case shall the amount so allowed or credited exceed the amount of *the fine*." (Emphases added.) 725 ILCS 5/110-14(a) (West 2010).

¶ 133    Whether an assessment is a fine or a fee is a matter of statutory interpretation that this court reviews *de novo*. *People v. Jones*, 223 Ill. 2d 569, 580 (2006).

¶ 134    The Illinois Supreme Court has articulated the difference between a "fee" and a "fine," as follows:

> " 'A "fine" is a pecuniary punishment imposed as part of a sentence on a person convicted of a criminal offense. [Citation.] A "cost" is a charge or fee taxed by a court such as a filing fee, jury fee, courthouse fee, or reporter fee. [Citation.] Unlike a fine, which is punitive in nature, a cost does not punish a defendant in addition to the sentence he received, but instead is a collateral consequence of the defendant's conviction that is compensatory in nature. [Citation.] A "fee" is a charge for labor or services, especially professional services. [Citation.]' " (Emphasis removed.) *Jones*, 223 Ill. 2d at 581 (quoting *People v. White*, 333 Ill. App. 3d 777, 781 (2002)).

Later, the supreme court explained that, "under *Jones*, 223 Ill. 2d at 600, the most important factor" in finding that a charge is a fee "is whether the charge seeks to compensate the state for any costs incurred as the result of prosecuting the defendant." *People v. Graves*, 235 Ill. 2d 244, 250 (2009).

¶ 135    The appellate court has previously, and repeatedly, held that both the $15 State Police operations fee and the $50 court systems fee are actually fines, and the State agrees that this precedent applies. *People v. Jones*, 2017 IL App (1st) 143766, ¶ 52 (court systems fee and State Police operations fee); *People v. Blanchard*, 2015 IL App (1st) 132281, ¶ 22 (court systems fee); *People v. Ackerman*, 2014 IL App (3d) 120585, ¶ 30 (court systems fee); *People v. Moore*, 2014 IL App (1st) 112592, ¶ 46 (State Police operations fee); *People v. Wynn*, 2013 IL App (2d) 120575, ¶ 13 (State Police operations fee); *Wynn*, 2013 IL App (2d)

120575, 17 (court systems fee); *People v. Smith*, 2013 IL App (2d) 120691, ¶ 16 (State Police operations fee); *Smith*, 2013 IL App (2d) 120691, 17 (court systems fee); *People v. Millsap*, 2012 IL App (4th) 110668, ¶ 31 (State Police operations fee). Thus, we order that defendant's presentencing credit must be applied against these two charges.

¶ 136                                                C. Total Due

¶ 137          We recapitulate here exactly what defendant does, and does not, owe.

¶ 138          First, the fines and fees order, entered on January 7, 2016, lists four fines, totaling $50, which are offset against the sentencing credit. Since they are offset, they do not count toward the amount owed by defendant.

¶ 139          Second, the 2016 order lists $120 in fines that are not offset. However, as we explained above, these violent crime victims assistance fines do not apply to defendant.

¶ 140          Third, the 2016 order lists six fees that are not offset. However, as we explained above, two of these charges—the $15 State Police operations fee and the $50 court systems fee—are fines that should be offset and, thus, these two charges do not count toward the amount that defendant owes. The remaining four fees, which are not offset, total $285, which is the amount that defendant now owes.

¶ 141          If you compare this amount against what this court ordered previously, you will see that there is a discrepancy. Previously, this court ordered defendant to pay $365. *Robinson*, 2015 IL App (1st) 130837, ¶ 115. Today we reduced what we previously ordered by $65 (the $15 State Police operations fee, plus the $50 court systems fee). Therefore, one would expect that defendant now owes $300, rather than $285. The $15 difference can be explained by the fact that, on remand, the trial court did not reenter a $15 document storage fee (705 ILCS

105/27.3c (West 2010)) on the new fines and fees order.[10] Since the State does not argue on appeal that this was in error, defendant now owes only a total of $285.

¶ 142                                                CONCLUSION

¶ 143          For the foregoing reasons, we do not find persuasive defendant's *Krankel* argument, but we correct the fines, fees, and costs due from defendant to $285.

¶ 144          Affirmed; fines and fees order corrected.

---

[10]In fact, on the fines and fees order entered on January 7, 2016, the document storage fee was written in by hand and then crossed out by hand.