2021 IL App (1st) 191390-U

No. 1-19-1390

Order filed June 9, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 10002 |
| | ) | |
| CLIFTON CARTER, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Affirmed.  Trial court did not err by denying *pro se* post-trial claim of ineffective assistance of counsel. Defendant's sentence was not excessive.

¶ 2    After a bench trial, the trial court convicted defendant Clifton Carter of aggravated battery with a firearm and sentenced him to 14 years' imprisonment. Defendant appeals, arguing the court (1) erred by denying his *pro se* post-trial claim of ineffective assistance of counsel without appointing him new counsel to pursue it; and (2) abused its discretion by sentencing him to 14 years' imprisonment. We find no error and affirm.

¶ 3     The State charged defendant by indictment with five counts of attempt first degree murder, three counts of aggravated kidnapping, and one count of aggravated battery with a firearm, alleging that, on June 2, 2018, he shot Carmen Alcala after knowingly and secretly confining her against her will. The matter proceeded to a bench trial.

¶ 4     Alcala testified that, on June 2, 2018, she was working as a prostitute when defendant, whom she identified in court, approached her in a white, two-door pickup truck and asked if she "wanted to make some money." Alcala got in the truck. Defendant drove to the back of an abandoned building. There, defendant smoked crack cocaine, while Alcala had two or three "pulls" from the pipe.

¶ 5     Defendant then drove to his house near 83rd and LaSalle Streets and parked his truck in the rear. They went downstairs into the basement and entered defendant's bedroom. Alcala was intoxicated and did not want to be there. The two continued to "get*** high." Alcala performed oral sex on defendant. When defendant began acting paranoid, Alcala became scared and stopped smoking.

¶ 6     A few moments after they got downstairs, defendant's brother appeared, and he and defendant smoked cocaine together as Alcala swept defendant's bedroom. Defendant urged Alcala to undress, but she refused. Defendant's brother retrieved a gun from a blue storage tub, gave it to defendant, went to the other side of the basement to continue smoking, and eventually went back upstairs.

¶ 7     After defendant obtained the gun, Alcala attempted to leave, telling defendant she had asthma and could not breathe. Defendant told her to "shut up" and take off her clothes. Alcala then ran toward the basement door. Defendant blocked her path, waved his gun, and asked her why she

would "try to do that when he ha[d] a gun in his hand." Defendant walked her to the bathroom and again directed her to undress. She instead ran up the stairs. Defendant followed her, placed the gun against her left hip, and shot her.

¶ 8 Alcala continued up the stairs, ran through the kitchen, past defendant's mother and brother, and out the door. She continued running through the gangway to the front of the house, crossed LaSalle, and encountered a mail carrier a few houses down, whom she asked for help. The police and paramedics arrived shortly.

¶ 9 Officers presented an unidentified man to her and asked whether he was the man who had shot her, and Alcala told them he was not. An officer also brought her defendant's state identification (ID) card, and though she was bleeding, short of breath, in extreme pain, and her vision was "blurry," she identified defendant in the photograph on the ID card as the man who had shot her.

¶ 10 Paramedics transported Alcala to the hospital, where she was placed in a medically induced coma for five days before undergoing three surgeries. While in the hospital, on June 12, 2018, she met with detectives and identified defendant as her shooter in a photographic array.

¶ 11 Alcala was discharged from the hospital and sought treatment for her drug habit. She later gave a videotaped statement to detectives and an assistant state's attorney. The State's Attorney's office provided her with a hotel room and money to cover some meal expenses. The office also offered to relocate her over safety concerns, but she declined. On the day of trial, the State's Attorney's office arranged her transportation to and from the courthouse and bought her lunch.

¶ 12 On cross-examination, Alcala testified she had been using cocaine for about a year before the shooting and occasionally used heroin, though her heroin use was not a habit. At the time of

trial, however, she had not used drugs in approximately nine months. On the morning of the shooting, she used one bag of heroin before meeting with defendant. She denied that someone came through the basement door while she was in the basement and that someone other than defendant shot her.

¶ 13    Officer Victor Galaviz testified that he responded to the scene and, after speaking with Alcala and learning where she had been shot, he walked toward defendant's house. There, he encountered a man, who was "very jumpy," speaking fast, and seemed "very nervous." He walked the man back toward Alcala and performed a show-up. Alcala did not identify the man as her shooter.

¶ 14    Officer Ross Hapaniewski testified that he responded to the scene and entered defendant's residence. He searched the basement bedroom and recovered a woman's purse and defendant's state ID card. He showed the card to Alcala, and she identified defendant from the photograph as the man who had shot her.

¶ 15    Detective Frederick Hasenfang testified that, on July 4, 2018, he learned that, one day earlier, defendant had been arrested while driving a Ford pickup truck, and he went to defendant's residence to speak with other individuals who resided there. The pickup truck was parked behind defendant's residence and had recently been spray-painted black. According to Hasenfang, the truck smelled like fresh spray paint and it had "spots on it where you could see the white bleeding through." He looked through the window on the truck and did not see a gun or blood stains.

¶ 16    Evidence technician John Heneghan testified that he processed the scene and observed suspect blood and a suspect bullet hole inside the house and suspect blood outside it. He collected swabs of the suspect blood and inventoried it for analysis. He also recovered a fired bullet.

¶ 17    The State presented two stipulations. The first established that a gunshot residue (GSR) kit was collected from defendant's brother, Marcus Carter, and it was determined that Marcus "may not have discharged the firearm" with either hand and, if he did, then GSR particles were not deposited, removed by activity, or were not detected by the procedure. The second stipulation established that blood swabs collected from inside the residence contained Alcala's deoxyribonucleic acid (DNA).

¶ 18    The State rested, and defendant moved for a directed finding on all charges. The trial court granted in part and denied in part the motion, finding the State had not met its burden on the kidnapping charges, and entered findings of not guilty on those charges.

¶ 19    Defendant testified that, on June 2, 2018, while he was driving home from work, he saw Alcala, whom he had met about a week earlier, standing at 73rd Street and Ashland Avenue. He pulled over and asked her if she wanted to "party." Alcala got into his truck. They drove around the corner and began smoking crack cocaine and snorting heroin, which defendant supplied.

¶ 20    Defendant asked Alcala if she wanted to go to his house because he did not "want to be doing drugs on the street and [he] wanted to get intimate with her." Alcala told defendant she did not want to go far without knowing where she was going, so defendant gave her his address, and Alcala called her "pimp" to let him know where she was going.

¶ 21    Defendant drove to his house, where he lived with Marcus, his mother, and his sister, and they went into the basement from an outside entry door, which defendant explained was never locked, and into his bedroom. The two used more cocaine and heroin and, after about 10 or 15 minutes, defendant asked Alcala what "she [was] going to do *** for [him]." Alcala started performing oral sex on him in exchange for $40 and three or four bags of cocaine. She "kept on

stopping[,] *** wanted to smoke some more[,]*** and was real jittery," so defendant told her to stop and walked to his bathroom to wash himself.

¶ 22    As defendant exited the bathroom, he saw Alcala on the stairs and an unidentified individual walking quickly along the side of the house and "getting ready to come down [his] stairs." Defendant ducked between his washer and dryer, and a hooded man came inside holding a gun. Defendant jumped out and tried to grab the gun, but "the gun went off" and struck Alcala. Alcala ran upstairs, through the kitchen, and outside. After a brief struggle, the man ran out. Defendant grabbed his pants, ran outside, and saw that Alcala and the man had run in different directions. Defendant panicked, grabbed his drugs, and drove away in his white truck.

¶ 23    Defendant testified that Marcus was upstairs when the shooting occurred. He denied shooting Alcala and believed Alcala had called the man "to come over there and stick [him] up." He explained his truck had previously been laminated white with his business sign, but he ripped the laminate off after the shooting, exposing black primer, because he did not want to be recognized at the time.

¶ 24    The trial court found defendant guilty of aggravated battery with a firearm but not guilty of attempt first degree murder, finding the State had not proved he intended to kill Alcala. The court explained that it took Alcala's demeanor into consideration and noted she never wavered as to who shot her or what occurred and had no motive to lie. On the other hand, the court did not find defendant's explanation of the incident credible, especially given there was no evidence corroborating his testimony that there had been a struggle over the gun.

¶ 25    Defense counsel filed a motion for new trial. The same day, defendant *pro se* filed a "motion for a continuance to prepare a *Krankel* [*People v. Krankel*, 102 Ill. 2d 181 (1984)] motion," wherein he generally asserted trial counsel was ineffective.

¶ 26    At the next court date, the trial court acknowledged it had received defendant's *pro se* motion and asked defendant to specify how counsel's performance was deficient. Defendant told the court, in relevant part, that his trial counsel failed to subpoena Marcus to testify and that counsel told him counsel unsuccessfully tried to call Marcus on the phone. Defendant told the court Marcus would have testified that he did not have a gun and rebutted Alcala's testimony that he handed defendant a gun. The court asked trial counsel to explain what happened with regard to Marcus, and counsel stated as follows:

> "My investigator early on interviewed [Marcus] so we had what [Marcus] saw and said, all right? And then I contacted [Marcus], but he didn't call me again to see if he wanted to testify and what else he may have had after the trial.
>
> And so there was plenty of outreach. I had my theme and theory of the case, which [Marcus] didn't play a role into that which matched what [defendant] told me. My theme and theory ran parallel to his statements to me, Judge."

The court asked counsel whether Marcus failed to contact him until after trial, and counsel responded in the affirmative. The court then asked defendant if he needed additional time to prepare additional arguments regarding counsel's alleged ineffectiveness, and defendant responded affirmatively.

¶ 27    Defendant thereafter filed a "motion for post-trial hearing pursuant to *** *Krankel*," wherein he asserted, as relevant here, he was denied his right to effective assistance of trial counsel,

as counsel "failed to subpoena, interview[,] and call Marcus *** who was interviewed by Detectives and would testify that at no time did he witness the incident resulting in the shooting of *** Alcala, nor did he ever give [defendant] a gun on, before or after June 2nd, 2019, which is what he told investigating detectives."

¶ 28 Defendant claimed that competent counsel would have called Marcus as a witness, as Marcus was the only witness who could have contradicted Alcala's testimony that Marcus gave him a gun and who could have corroborated his own testimony. Defendant further argued he was prejudiced by counsel's failure, as the evidence was closely balanced, and Alcala was not a credible witness given her drug habit and prior convictions. Defendant attached to his motion an affidavit in which he averred, *inter alia*, he told counsel to subpoena his brother, who would testify "he did not give [defendant] a gun, nor was he in the basement when the incident happened."[1]

¶ 29 The trial court conducted a hearing on defendant's motion and inquired with defendant regarding his allegation that counsel failed to call Marcus as a witness. Defendant claimed that counsel told him he had called Marcus on the phone but could not get in contact with him. Though asked by the court, defendant did not state whether he told Marcus to be present for trial. The court inquired with counsel, and counsel told the court his investigator interviewed Marcus at the beginning of the case and the investigator had "a very uneasy feeling *** about the comments that *** both brothers made about the victim," and, as a result, he "did not feel they would be worthy witnesses." Counsel also stated that he attempted to contact Marcus "plenty of times" to reinterview him, that on the day of trial, he told defendant of his unsuccessful attempts to contact

---

[1] Defendant also alleged counsel was ineffective for failing to impeach Alcala with her criminal history. That claim is not pressed on appeal.

Marcus, and that defendant decided to proceed without him. Defendant interjected that he did not decide to proceed without Marcus. Counsel continued, "as a strategic decision, [he] didn't think the brother would add, only hurt the case." Defendant again interjected, stating, "You got to understand, they said that my brother hand me a pistol. He could have came and collaborated [*sic*] my story."

¶ 30    The trial court denied defendant's motion, finding the allegations did not warrant the appointment of new counsel to pursue the claims. The court found that, based on its inquiry, counsel's decision not to call Marcus was a strategic one. The court explained that counsel made contact with and interviewed Marcus (via his investigator) and thus did not completely ignore him. The court accepted counsel's representation that defendant was ready to go to trial, and counsel abided by that decision. With respect to his claim that counsel failed to appropriately cross-examine or impeach Alcala, the court noted that it had considered Alcala's demeanor and, though she was not the best witness, it accepted her story and rejected defendant's, given that Alcala's testimony was corroborated by the other evidence. The court also denied the motion for new trial filed by counsel.

¶ 31    The matter proceeded immediately to a sentencing hearing. The trial court confirmed the parties' receipt of defendant's presentence investigation report (PSI). The PSI indicated defendant was 48 years old at the time of the offense and had amassed a significant criminal history, including the following felony convictions: (1) battery in 1990, for which he was sentenced to 1 year of probation and later resentenced to 264 days in the county jail;  (2) receipt or possession of a stolen motor vehicle in 1991, for which he was sentenced to 3 years' probation and later resentenced to two years' probation; (3) vehicular hijacking in 1995, for which he was sentenced to 78 months'

imprisonment; (4) robbery in 2000, for which he was sentenced to 4 years' imprisonment; (5) possession of a controlled substance in 2003, for which he was sentenced to 6 years' imprisonment; (6) driving under the influence of alcohol (DUI) and driving on a revoked or suspended license in 2008, for which he was sentenced to 1 year of imprisonment; (7) DUI and driving on a revoked or suspended license in 2010, for which he was sentenced to 18 months' probation and later resentenced to 1 year of imprisonment; and (8) aggravated DUI in 2012, for which he was sentenced to 18 months' imprisonment.

¶ 32    The PSI further indicated defendant had been convicted of seven misdemeanors, including theft, domestic battery, soliciting a prostitute, resisting or obstructing a peace officer, and reckless conduct, and various traffic offenses.

¶ 33    Defendant was raised in a stable home by both parents, and he maintained a good relationship with both parents and his five siblings. Defendant reported that he was an average student, graduated from Mendel Catholic High School in 1988, and attended Kennedy-King College for two years, though he left before obtaining his degree so he could work. Defendant owned and operated his own business, lived with his mother but paid most of the household expenses, and owed about $18,000 in child support. Defendant had a significant history of drug and alcohol use. He first used alcohol at age 13 and, by age 23, his usage had increased to a "fifth of hard alcohol per day." At age 33, however, defendant stopped drinking until he turned 47 years old, at which time he "returned to drinking a pint of hard alcohol per day." Defendant also used cocaine and heroin regularly from age 20 to 28 and stopped until he turned 47 years old, at which time he returned to using $50 worth of cocaine and $50 worth of heroin per day.

¶ 34    The trial court asked the parties whether they had any additions, deletions, changes, or corrections to the PSI, and defense counsel informed the court defendant was entitled to presentence custody credit. Defendant then informed the court that he participated in the "Second Chance program, *** Christian Ministry group, [and] Joseph Business School" while in custody and was seeking additional credit against his sentence, which the court granted.

¶ 35    In aggravation, the State emphasized the circumstances of the crime and defendant's criminal history and argued that a sentence of at least 22 years was appropriate, as defendant was a "danger to society" who had failed to learn from his numerous previous contacts with the criminal justice system. In mitigation, defense counsel argued for the minimum sentence, as defendant had "turned his life around," as demonstrated by the classes he had taken and because he intended to return to being a productive member of society, which he was at the time of the offense. In allocution, defendant apologized to the court, the city of Chicago, and its police department and stated he did not deserve "a whole bunch of time in jail."

¶ 36    In announcing sentence, the trial court noted defendant went to a great high school and had a supportive family and a good job but nevertheless decided to mix alcohol, cocaine, and heroin, and had a significant criminal history. The court observed the applicable sentencing range was 6 to 30 years, and that one of its considerations was defendant's rehabilitative potential, particularly in light of his history of substance abuse. Defendant twice interjected that he had been "clean" for 18 years and that everything "spiraled right down," and he requested that he be sent to a drug-rehabilitation program. The court further noted it had reviewed the PSI, the facts of the case, and defendant's statement in allocution and, after stating it believed defendant was sorry, sentenced

him to 14 years' imprisonment with a recommendation that he be enrolled in a drug rehabilitation program.

¶ 37    Defendant filed a motion to reconsider sentence, which the trial court denied. This appeal followed.

¶ 38     On appeal, defendant first claims the trial court erred in denying his *pro se* post-trial claim of ineffective assistance of counsel. He says he presented a plausible claim of ineffective assistance of trial counsel based on counsel's failure to present the testimony of Marcus, such that the court should have appointed new counsel to pursue the claim further.

¶ 39    When a *pro se* defendant raises a post-trial claim of ineffective assistance of counsel, *Krankel* and its progeny require the trial court to ascertain the factual basis of the defendant's claim and determine whether to appoint new counsel to pursue it. *People v. Roddis*, 2020 IL 124352, ¶ 35. "If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Id.* "A claim lacks merit if it is conclusory, misleading, or legally immaterial or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel." (Internal quotation marks omitted.) *People v. Robinson*, 2017 IL App (1st) 161595, ¶ 84. If, however, the allegations show possible neglect of the case, the court should appoint new counsel to represent the defendant, so that new counsel can independently evaluate the claim and avoid the conflict of interest that trial counsel would inevitably have in trying to justify his or her own actions contrary to the defendant's position. *Roddis*, 2020 IL 124352, ¶¶ 35-36.

¶ 40    The trial court is permitted to consider both the factual and legal merits of the defendant's claim. *Id.* ¶ 61. When, as here, the trial court determines the claim lacks merit and declines to

appoint new counsel, we will reverse only if the court's action was manifestly erroneous. *People v. Jackson*, 2020 IL 124112, ¶ 98. Manifest error is that which is "clearly evident, plain, and indisputable," or, stated differently, "a decision is manifestly erroneous when the opposite conclusion is clearly evident." (Internal quotation marks omitted.) *People v. Coleman*, 2013 IL 113307, ¶ 98.

¶ 41    After reviewing the record, we conclude that the trial court did not err in finding that defendant's ineffective-assistance claim did not warrant the appointment of new counsel. To prevail on a claim of ineffective assistance of counsel, the defendant must show his counsel's performance fell below an objectively reasonable standard, and the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Caballero*, 126 Ill. 2d 248, 259-60 (1989). That is, the defendant must demonstrate that counsel's performance was "objectively unreasonable under prevailing professional norms" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." (Internal quotation marks omitted.) *People v. Cherry*, 2016 IL 118728, ¶ 24. Because defendant must meet his burden on both the performance and prejudice prongs, his failure to establish either forecloses the claim. *Id.*

¶ 42    To satisfy the first prong of the *Strickland* analysis, the defendant must overcome a strong presumption the challenged action was the product of sound trial strategy as opposed to incompetence. *People v. Murphy*, 2019 IL App (4th) 170646, ¶ 34. "[T]he decision whether to call a certain witness for the defense is a matter of trial strategy, left to the discretion of counsel after consultation with the defendant." *People v. Peterson*, 2017 IL 120331, ¶ 80. Such decisions rarely support ineffective-assistance claims. *Id.* Additionally, mere mistakes or errors in judgment as they

relate to trial strategy will not alone render counsel's representation constitutionally defective. *Id.* Rather, ineffective assistance will be found only if counsel's strategy is so unsound that he or she entirely fails to meaningfully test the State's case. *Id.*

¶ 43    Based on our review of the record, defendant has failed to demonstrate that counsel's decision to proceed to trial without Marcus was not within the realm of trial strategy. See *id.* ¶ 88. Counsel told the court that his decision not to subpoena Marcus and present his testimony was a product of his trial strategy, and he explained the reasoning behind it. His investigator interviewed Marcus at the outset of the case and, based on Marcus's statements about the case and the victim, he determined Marcus's testimony did not match what defendant had told him and would not fit the "theme and theory" of his case. He further explained that he did not believe Marcus would be a credible witness and would hurt, rather than help, the case. Defendant's ineffective-assistance claim clearly relates to counsel's trial strategy and thus cannot serve as the basis of a *Krankel* claim. See *Jackson*, 2020 IL 124112, ¶ 106.

¶ 44    We are not persuaded by defendant's reliance on *People v. King*, 316 Ill. App. 3d 901 (2000). In *King*, which involved an appeal from the third-stage denial of defendant's petition for relief under the Post-Conviction Hearing Act, the defendant claimed his counsel was ineffective due to counsel's failure to call an available alibi witness. *Id.* at 903. At the evidentiary hearing on the petition, trial counsel testified that he had spoken with and subpoenaed the alibi witness but was not able to recall the specific reasons he did not call her as a witness. *Id.* at 906. Further, counsel testified that the decision was one of "trial strategy," and that he could "only assume" he determined calling the alibi witness would not be helpful to the defense. *Id.*

¶ 45 This court found the "mere characterization of counsel's decision not to call an available alibi witness as 'trial strategy' [did] not preclude inquiry as to the reasonableness of counsel's strategy" and "decline[d] to assume, without any explanation, that [counsel's] failure to call [the alibi witness] was the product of *sound* trial strategy." (Emphasis in original.) *Id.* at 915-16.

¶ 46 Unlike in *King*, trial counsel here did not merely assume calling Marcus would not be helpful to the defense. Rather, trial counsel specifically explained exactly why he did not call Marcus. Counsel further explained that, despite his attempts to reinterview Marcus, Marcus was unresponsive until after trial.

¶ 47 We are also not persuaded by defendant's related argument that counsel provided conflicting explanations for not presenting Marcus's testimony, which supports a finding that the failure to do so was not the product of sound trial strategy. Specifically, defendant notes that counsel (1) initially explained that he did not present Marcus's testimony because, though his investigator had interviewed Marcus, Marcus did not contact him with respect to testifying until after trial; and (2) then explained he did not present Marcus's testimony because "he didn't play a role" in his "theme and theory" of the case. These two explanations are not contradictory. Rather, both of counsel's statements explain why counsel did not seek to subpoena Marcus after determining he may not voluntarily appear.

¶ 48 Because defendant could not establish deficient performance, his *Strickland* claims fails, and we need not consider the second element of prejudice. *Cherry*, 2016 IL 118728, ¶ 24. The court did not commit manifest error in refusing to advance this cause to a full *Krankel* hearing.

¶ 49 Defendant next contends his sentence was excessive.

¶ 50    The Illinois Constitution states "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all aggravating and mitigating factors, including: "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 51    The trial court, not the reviewing court, is in the best position to assess these factors because it has observed the defendant and the proceedings. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). The trial court thus has broad discretionary powers in imposing a sentence, which are entitled to great deference. *Id.* at 212. We do not reweigh the evidence in aggravation and mitigation or substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Instead, we will overturn a sentence only where the trial court has abused its discretion. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. When, as here, the sentence falls within the sentencing range, we will find an abuse of discretion only if the sentence "is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 52    After reviewing the record, we conclude the trial court did not abuse its discretion when it sentenced defendant to 14 years' imprisonment. The offense of aggravated battery with a firearm is a Class X felony, which carries a sentencing range of 6 to 30 years' imprisonment. 720 ILCS

5/12-3.05(h) (West 2018); 730 ILCS 5/5-4.5-25(a) (West 2018). The sentence fell comfortably within and on the low range of possible sentences.

¶ 53    Regardless, defendant argues the trial court failed to properly consider his history of drug and alcohol addiction as a mitigating factor warranting a lesser sentence. According to defendant, his 14-year sentence does not serve a rehabilitative purpose and "would not help [him] get the help he so desperately needs." He complains that the trial court "was well-aware of [his] drug and alcohol addiction problems" but nevertheless "gave insufficient weight to those factors when fashioning the sentence."

¶ 54    Defendant essentially asks this court to reweigh the evidence presented in aggravation and mitigation and substitute our judgment for that of the trial court. We cannot usurp a function uniquely reserved for the trial court. See *Stacey*, 193 Ill. 2d at 209.

¶ 55    That is especially so when, as here, the record shows that, in imposing sentence, the court appeared to give careful weight and consideration to defendant's history of drug abuse. In announcing sentence, the court noted that defendant went to a great high school and had a supportive family and a good job but nevertheless decided to mix alcohol, cocaine, and heroin, and had a significant criminal history. The court noted that one of its considerations was defendant's rehabilitative potential, particularly in light of his history of substance abuse. The court further stated that it had reviewed the PSI, the facts of the case, and defendant's statement in allocution and believed that defendant showed genuine remorse for his crime. The 14-year sentence was on the lower end of the Class X sentencing range, and the court recommended defendant be enrolled in a drug rehabilitation program.

¶ 56    We also find defendant's sentence warranted in light of the serious nature of the offense. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123 (seriousness of offense is most important sentencing factor); *People v. Evangelista*, 393 Ill. App. 3d 395, 399 (2009) (finding defendant's criminal history "alone" may warrant sentence "substantially above the minimum"). Here, the record shows defendant shot Alcala as she was attempting to leave his residence, ultimately resulting in Alcala being placed in a medically induced coma before having three surgeries to repair damage caused by the bullet and requiring a lengthy hospital stay. The record shows defendant did not attempt to render aid to Alcala but instead retrieved his drugs and drove away from the scene and later changed the color of his truck because he did not "want to be recognized at the time."

¶ 57    And as noted, defendant had a significant criminal history. Since reaching the age of 20, defendant has been convicted of eight felonies, seven misdemeanors, and several traffic offenses. Indeed, defendant has demonstrated a pattern of lawlessness which has spanned his entire adult life. In light of the nature of this offense and defendant's sustained pattern of lawlessness, we cannot say that defendant's 14-year sentence was inappropriate. The trial court did not abuse its discretion in the sentence it imposed.

¶ 58    The judgment of the trial court is affirmed.

¶ 59    Affirmed.